Gunter, Appellant, v. Gunter.

Argued November 19, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Kenneth B. Burkley*, with him *John A. Kopay*, for appellant.

*Walter B. Cope, Jr.*, and *Miller and Cope*, submitted a brief for appellee.

OPINION BY SPAETH, J., March 29, 1976:

This is an appeal from an order changing the custody of a seven year old boy, whose name is David, from his mother to his father. The order must be set aside and the record remanded with a *procedendo*. There are two reasons for this conclusion. First, the hearing judge

relied on David's statement that he would prefer to be with his father; this statement, however, was not transcribed. Second, the testimony presented to the judge was most incomplete; nor does the judge's opinion assist us in appraising it. Because of these deficiencies we cannot in good conscience say whether David's best interests have been served.

## I

At the hearing, the mother testified on the one side, the father, his second wife, and his mother, on the other. The hearing judge then said: "I want to see the boy with the attorneys." (N.T. 38.) The record states that there ensued a "Conference in Chambers." After the conference, the judge returned to the courtroom, and said to the parties·

> "I talked to the little boy just a little and — while, of course, he is very young yet, only seven years old — what I get from him, he loves his mother and his father both; not downgrading one over the other." (N.T. 39-40.)

The judge then dictated his order, awarding the custody of David to the father and providing for visits by the mother, and concluded by saying:

> "I did ask him one thing — I said, 'If I say you are to live with your father will you cry when you have to go to visit with your mother?' Before both attorneys he said he would not.
> "That is the present Order of the Court. Custody is to take effect immediately. All right." (N.T. 41.)

In his opinion filed pursuant to Rule 46 the hearing judge goes beyond this record, stating:

> "The Court, in the presence of the attorneys representing the petitioner [the mother] and the respondent [the father], asked David with which parent he would like to make a permanent home and he definitely said he would like to live with his father. The Court asked him if the Court would direct that he make his

home with his father if he would be willing to go and visit his mother and not cry when he visited her and he replied that he would visit his mother and would not cry." (Opinion of Lower Court, at 2.)

Counsel for the mother in his brief to us

"contends ... that there was other testimony given in the Judge's Chambers that should be available to this Honorable Court to assist it in its broad reviewing powers.

. . . .

"David was not asked by the Court why he would rather live with his father nor was he asked any questions concerning his home life with his mother, with whom he had lived his entire life. Counsel for appellant, [the mother] however, did ask David why he wanted to live with his father, to which David replied 'I don't know.' " (Brief for Appellant, at 11.)

-A-

In *Commonwealth ex rel. Morales v. Morales*, 222 Pa. Superior Ct. 373, 375-376, 294 A.2d 782, 783 (1972), it is stated:

"Under both the statutory and case law, the scope of our review in child custody cases is quite broad and, while we cannot nullify the fact-finding function of the hearing judge, we are not bound by a finding which has no competent evidence to support it. *Commonwealth ex rel. Gifford v. Miller*, 213 Pa. Superior Ct. 269, 273-274, 248 A.2d 63 (1968) and cases cited therein. The decision of the court below here has nothing on the record which supports it due to the incorrect procedure followed in hearing the testimony of the children. If this testimony is to be taken out of the presence of the contending parties, counsel should be present and have an opportunity to examine them, *Snellgrose Adoption Case*, 432 Pa. 158, 166, n. 3, 247 A.2d 596 (1968), and this testimony should be on the record."[1]

---

1. In *Commonwealth ex rel. Holschuh v. Holland-Moritz*, 448 Pa.

The order of the lower court was therefore reversed and the record remanded.

Similarly, in *Williams v. Williams*, 223 Pa. Superior Ct. 29, 33, 296 A.2d 870, 872 (1972), reversing the order of the lower court, it is stated:

> "While the court below found that the children had expressed a preference to remain with their father, there is no record of any testimony by the children. Such testimony is necessary to support a finding of the children's preference where, as here, it is the principal reason for awarding them to their father. *See Commonwealth ex rel. Morales v. Morales ...."*

In *Commonwealth ex rel. Bowser v. Bowser*, 224 Pa. Superior Ct. 1, 302 A.2d 450 (1973), there is favorable comment on the fact that in taking a child's testimony, the lower court had done "exactly that which we have indicated is most appropriate [citing *Williams* and *Morales*]." *Id.* at 3 n. 1, 302 A.2d at 451 n. 1.

Finally, in *Commonwealth ex rel. Grillo v. Shuster*, 226 Pa. Superior Ct. 229, 237-38, 312 A.2d 58, 63 (1973), it is stated:

> "Perhaps the most important facts not mentioned in the hearing judge's opinion are what he was told by the three children [footnote omitted]. At the close of the hearing the children were individually questioned by the judge in chambers. Counsel were offered the right to be present but both declined. The substance of these conferences does not appear either in the transcript or in the opinion, nor does the opinion indicate the weight the hearing judge gave to what

---

437, 443, 292 A.2d 380, 383 (1972), it is stated: "Notwithstanding recent changes in the habeas corpus statutes pertaining to appeals in child custody proceedings, the scope of review of [the Supreme Court] and of the Superior Court remains that of the broadest type [footnote omitted]."

the children told him. The fact that we therefore do not know what the children told the judge by itself necessitates remand [citing and quoting from *Commonwealth ex rel. Morales v. Morales, supra*]."

-B-

It is evident from the foregoing decisions that the order of the lower court must be reversed.

First, the hearing judge failed to follow the prescribed procedure, for although he permitted counsel to be present and to question David, he did not direct that a transcript be made.

Second, in consequence of this failure, we cannot tell what David told the hearing judge. It is true that immediately after David had been questioned, the judge summarized for the record some of the testimony. Later, however, in his opinion, the judge expands on this summary, and characterizes the testimony, stating that he asked David "with which parent he would like to make a permanent home," and that David "definitely said he would like to live with his father." However, what does "definitely" mean? What exactly did David say, and what questions elicited and followed his answer? Is counsel for the mother correct in his recollection that when David was asked why he wanted to live with his father, he replied, "I don't know"? Whatever David said, it was not much. The hearing judge himself said, "I talked to the little boy just a little ...." Moreover, the judge's summary on the record of what David said is not the same as the judge's summary in his opinion. On the record the judge said: "[W]hat I get from him, he loves his mother and his father both; not downgrading one over the other." The judge said nothing about David "definitely" preferring his father; that is said only in the opinion.

Finally, whatever it was that David said, the hearing judge evidently attached considerable importance to it,

for although the opinion is very short (under two and one half pages), the summary of what David said occupies a central part in it.[2]

There being no competent evidence to support the hearing judge's finding that David would prefer to be with his father, we are not bound by the finding. *Commonwealth ex rel. Morales v. Morales, supra.* It is arguable that for the sake of clarity we should announce a prophylactic rule that the failure to transcribe a child's testimony will by itself result in remand; certainly the failure is not to be condoned. So far, however, our cases have only gone to the point of ordering remand where given the failure to transcribe the child's testimony, the record is too incomplete to permit us to discharge our responsibility to exercise "the broadest type" of review. *Commonwealth ex rel. Grillo v. Shuster, supra; Commonwealth ex rel. Holschuh v. Holland-Moritz, supra.* As will be discussed in the next section of this opinion, that is the case here.

Counsel for the father has argued in his brief that the error of the hearing judge in not ordering a

---

2. It may be noted that David's youthfulness required some rather considerable discounting of what he said. *See, e.g., Carlisle Appeal,* 225 Pa. Superior Ct. 181, 183, 310 A.2d 280, 282 (1973); *Commonwealth ex rel. Bender v. Bender,* 197 Pa. Superior Ct. 397, 401, 178 A.2d 779, 781 (1962). At the hearing, the judge indicated awareness of this: "I talked to the little boy just a little and — while, of course, he is very young yet, only seven years old — what I get from him .... [etc]." (N.T. 39-40). In this connection, it has been suggested by the pediatric psychiatrist Dr. Albert J. Solnit that the judge should always make plain to the child that the decision on custody will be the judge's own decision; the child should never be burdened with the decision. Dr. Solnit is also of the opinion that while children aged 10 or over are able to express their feelings, younger children do better in a play type of interview, during which they may use toys. The doctor observes that if asked by each parent, separately, "Wouldn't you rather live with me?", the child may truthfully reply "yes" to each parent. "Because they love both parents .... and really. in the long run, they wish that they'd get together." *See* N.Y. Times, October 14. 1975 at 44, col. 3.

transcript has been waived because counsel for the mother did not complain of it at the time, "[when it] could have been eradicated." (Brief for Appellee, at 11.) This argument mistakes the nature of a custody hearing. The sole purpose of the hearing is to determine what is in the best interests of the child. *Commonwealth ex rel. Parikh v. Parikh,* 449 Pa. 105, 107, 296 A.2d 625, 627 (1972) ("the best interest of the child is paramount"); *Commonwealth ex rel. Holschuh v. Holland-Moritz, supra* at 444, 292 A.2d at 383 ("all other considerations are subordinate"). It is David's future we are determining; he had a right to expect that the hearing judge would follow prescribed procedures. That right was not one that the hearing judge could ignore, or that either parent could waive. *Cf., Stapleton v. Dauphin County Child Care Service,* 228 Pa. Superior Ct. 371, 324 A.2d 562 (1974) (allocatur refused).

## II

### -A-

This court has repeatedly made plain that in a child custody case two requirements must be satisfied: the record must be complete; and the hearing judge must by his opinion give us the benefit of a thorough analysis of that record. If these requirements are not satisfied, the judge's order will be reversed and the record remanded with a *procedendo.*

Thus, in *Commonwealth ex rel. Ulmer v. Ulmer,* 231 Pa. Superior Ct. 144, 147-48, 331 A.2d 665, 667 (1974), after explicating the scope of our review as "of the broadest type," it is stated: "The difficulty with this case is that the lower court has not discussed the basis of the decision nor the evidence. In these circumstances we find ourselves unable to discharge our responsibility in good conscience. We might, independent of guidance by a thorough decision of the lower court, either affirm or

reverse. We perceive this to do violence to the rights of the parties to have their case weighed and decided by the trier of facts and determiner of credibility, i.e., the lower court. And even more important, such a course of action on our part would not properly recognize the great interest of this Commonwealth in the best interests and welfare of these children. Those considerations require that we refer this case back to the court below for further review and determination of the best interests and welfare of these children. While the record is complete, we do not limit the court in its discretion to this record as it may well appear that a further hearing may appear desirable."

Similarly, in *Augustine v. Augustine*, 228 Pa. Superior Ct. 312, 318, 324 A.2d 477, 480 (1974), it is stated: "We believe the incompleteness of the record precludes our making an independent determination. Not only should the record be expanded to reflect a careful and comprehensive inquiry into the ability of these parents to provide a stable and healthy atmosphere for the child, but 'the hearing judge should file in [this and] every custody case a comprehensive opinion reflecting a thorough analysis of the record as a whole and specifying the reasons for the ultimate decision.' *Commonwealth ex rel. Grillo v. Shuster, supra* at 237."

As this passage indicates, *Grillo* is also a case where the record was remanded. There it was emphasized that the record disclosed facts that appeared of importance but that were not even mentioned by the hearing judge. Because this selectivity was unexplained, the judge's opinion appeared one-sided and deprived us of the ability to make a reasoned decision.

-B-

When the foregoing decisions are applied to the record in the present case, it becomes evident that remand is required.

-1-

The mother is 27, the father, 29. The parties were married on July 12, 1966, and their son David was born on January 23, 1968. In February of 1971 the father in the company of another woman left his family in Indiana County and went to Texas. It is not clear what he did there; he may have been employed in some sort of electronics work. In any case, he was in Texas until May of 1974. During that period, on August 31, 1973, he got a divorce, and in October, 1973, he married the woman with whom he had left for Texas. She is 26 and from Indiana County. While in Texas the father made payments towards the support of David. Until his divorce, he paid $120 a month, decreasing this to $100 a month a couple of months before the divorce; after the divorce, it was $80 a month. In May of 1974 he and his second wife returned to Indiana County; they have no children.

While the father was gone, David lived with his mother, in Indiana County. In June of 1973 she started living with one George Clawson, and has lived with him since then. He is a police officer, 30, and divorced. He and the mother have not married. They have a daughter, Paula, who was evidently born about December of 1973.

Since May of 1974, David has spent the weekends with his father, who has continued to pay the mother $80 a month towards David's support.

It is quite impossible to read the hearing judge's opinion, especially in light of the record, without coming to the conclusion that the mother's relationship with Clawson represented to the judge an almost dispositive fact. A custody case may not, however, be so simply adjudicated.

An extra-marital, or to speak more generally, a non-marital, relationship will always be a fact requiring the most careful consideration in a custody proceeding. It is not, however, by itself a sufficient reason for the denial

of custody. (Indeed, if it were, the result might be that custody would not be awarded either parent. Here, for example, it seems evident that the father lived in a non-marital relationship with his present wife for over two and a half years.) Rather, "the prime consideration" must always be the best interests of the child, which the court must decide by considering *all* of the facts, including what effect the non-marital relationship has on the child. *Commonwealth ex rel. Burke v. Birch,* 169 Pa. Superior Ct. 537, 539, 83 A.2d 426, 427 (1951).

Thus, in *Burke* the court denied a father custody, awarding the child to grandparents, where the record disclosed "flagrant and persistent immoral conduct," *id.* at 542, 83 A.2d at 429, as well as continued financial irresponsibility and a history of indifference to the child. *Commonwealth ex rel. Likovich v. Likovich,* 220 Pa. Superior Ct. 202, 287 A.2d 156 (1971), was a similar case. There, the mother, while married, regularly entertained male visitors, sleeping with some of them; left her children with baby sitters while she visited bars, to return home as late as 4:00 a.m.; became pregnant and delivered a child, whom she abandoned; and became pregnant again, by a minor whom she promised to marry when he reached 21. Finding that her home "reflects an atmosphere of uncleanliness and sexual promiscuity," and that her "immaturity is existent, unrelenting, and reckless," *id.* at 204, 287 A.2d at 157-158, this court refused her custody.

Sometimes, however, the facts will show that on balance the child's best interest will be served by an award of custody despite the petitioner's conduct. Thus, in *Commonwealth ex rel. Gervasio v. Gervasio,* 188 Pa. Superior Ct. 95, 145 A.2d 732 (1958), there was some indication that the mother had been intimate with a man not her husband - although on indictment for adultery she and he had been found not guilty. Assuming the adultery, however, the hearing judge, quoted by this court with approval, found that the relationship "was not

a trifling relationship, but one which ripened into marriage." *Id.* at 99, 145 A.2d at 734. Moreover, the mother's second husband was interested in the children and willing and able to help maintain them, the home was clean, and the children well-cared for and happy. Custody was awarded the mother. This was also the result in *Commonwealth ex rel. Staunton v. Austin,* 209 Pa. Superior Ct. 187, 223 A.2d 892 (1966). There, the issue was who should have custody of a four year old girl, Christina. The mother had married in 1948 and separated in 1951; she never got a divorce. Starting in 1953, and into 1966, when the case was decided, she lived with one Thomas Staunton, by whom she had five children. Christina, one of these children, was born in 1962. Shortly after her birth, the mother became depressed and asked Mr. & Mrs. Austin to take care of her, which they did for a brief period. In June of 1963 the mother again became depressed, and again asked the Austins to take care of Christina, and again they did. In May of 1965 the mother told the Austins that she was well, and asked for Christina's return. When they refused, the mother sought an award of custody. The lower court granted her custody, and this court affirmed (WRIGHT and WATKINS, JJ., dissenting). After reviewing the evidence, and concluding that the mother's health was fully restored, it was stated:

> "Finally, mention should be made of the illicit relationship presently existing between Mr. and Mrs. Staunton.[2] Certainly, such a relationship is not to be condoned in our society. We believe, however, that the instant case presents unusual circumstances. We agree with the statement ... in the lower court, that: 'The illicit relationship ... has proved to be a durable de facto relationship. Christina and her three brothers and sister are the product of the union. It seems to the hearing judge the cohesive force of [the] Staunton family unit, as demonstrated through years of adversity, will prevail, and that Mr. and Mrs.

Staunton and the children will probably enjoy a reasonably normal and satisfactory family life. The strong claims of close consanguinity are not to be denied in favor of strangers to the blood unless clear, certain and compelling reasons require such an unnatural result ....

"2. There is a suggestion in the record that Mr. Campbell [the mother's husband] has instituted divorce proceedings against his wife. Mrs. Staunton stated that when a divorce decree is entered she would marry Mr. Staunton."

*Commonwealth ex rel. Staunton v. Austin, supra* at 194, 223 A.2d at 896. *And cf., Commonwealth ex rel. Sorace v. Sorace*, 236 Pa. Superior Ct. 42, 344 A.2d 553 (1975). (Visitation order affirmed. "While it is true that the appellee is living in an extra-marital relationship, the lower court found that his home is normal and morally satisfactory in every other respect." *Id.* at 44-45, 344 A.2d at 554).

In the present case, the mother's relationship with Clawson is not as in *Burke* or *Likovich*, but rather as in *Gervasio* or *Staunton*. The relationship arose only after the mother's husband left with another woman to go to Texas; and it has not been marked by sexual promiscuity, but rather has been a steady, familial (albeit non-marital) relationship.

On cross-examination of the mother the following occurred:

"Q. Why don't you and Mr. Clawson get married?

A. Because we both had bad marriages and things are quite well; things are going fine and that's it.

Q. You feel this is a proper atmosphere for David and your daughters to grow up in?

A. I feel there is a proper attitude for both our children and there is love in the home and affection between us two people, and if there is love and affection between two people the children will naturally grow and love from that.

Q. You have no intention of getting married; is that correct?

A. I didn't say.

Q. At this time.

A. At this time but it could be later on but right now things are fine and the children are happy." (N.T. 14-15).

The mother also testified: that Clawson contributes to David's support; that David "calls George [Clawson] 'Uncle George' and he has called him that from the time he met him, and he knows that George is not a blood uncle," (N.T. 14); that David's and Clawson's relationship is

"a very good one. He obeys George. He and George will go out and throw a ball and pitch back and they go out and garden and they sit and watch television together. He kisses George in the night before he goes to bed. It is a good relationship, I think." (N.T. 10);

and that the relationship between David and his sister Paula is

"[v]ery close; he worships the ground she walks on. And she's the same, she worships him. They are very close." (N.T. 10).

Considered by itself, there is nothing in this testimony to suggest that the relationship between the mother and Clawson, albeit non-marital, is detrimental to David's best interests; or, to state the issue more accurately, there is nothing to suggest that David's best interests will be served by taking him away from his mother, with whom he has been since his birth, and giving him to his father. Nor does the balance of the record support such a suggestion.

-2-

In his opinion the hearing judge states:
"The Court was very favorably impressed with the

stability of the father's home including the fact that the father's present wife would be very glad to have David in the home. The father and his present wife have no children."

Also:

"The Court, from all the testimony taken, is of the opinion that this boy would be much better off living with his father as it is by far a more stable home."

Perhaps in fact the father's home is more stable, but the record does not show that it is.

If the mother's and father's residences are compared in physical terms, there seems very little difference between them: the mother's a small farm house (N.T. 21), the father's a mobile home in a trailer court (N.T. 18). The only comment by the hearing judge regarding the residences is that "[w]hen David lives with his father and stays overnight, he has his own bedroom," contrasting this with the fact that when with his mother, David shares a bedroom with his sister, Paula. It is hardly unusual, however, or even undesirable, for a seven year old and a one and a half year old to share a bedroom. In any case, the mother testified that "[w]e have rented another house and the people will be out [in a week and a half], and it has three bedrooms on the main floor and a big bedroom upstairs." (N.T. 12.) This sounds rather more spacious than the father's residence. The judge, however, does not remark upon this testimony in his opinion.

Nor does it appear that financially the father's situation is any more stable than the mother's. Clawson, as has been mentioned, is evidently a police officer, and supports his family. The mother was asked on cross-examination whether she had received any welfare, and she replied that she had only received "one check after Merle [the father] left." (N.T. 14). What Clawson's salary as a police officer is or how long he has been an officer, does not appear. However, not much, if anything, more appears regarding the father's position. Apparently he

has some sort of experience in electronics,[3] but when asked just what he was doing as of the hearing, he only said:

"... now I have my own business, audio-stereo, and I plan to make it a full-time business. And I am also going to be operating a band and also I am with Amway program.

"Q. In what?

"A. Amway. That is a distributive program that you build on, products that you use in your home and such. You know, actually a three-way income."

. . . .

"Q. All right, now where is your business located?

"A. This business is located right now in my mother's basement, and this is where the shop area will be, I'd say, for the next year or two years; and then I'm going to begin an entire location on #422, sales and service; electronic stereo and stereophonic equipment." (N.T. 17-18).

Does this mean he does have a shop, or only plans to, that he does have some income (from Amway or otherwise) or only expects to? The record affords no answer to these questions.

Finally, and perhaps most important, neither does it appear that the father's home would be emotionally more stable for David; in fact, quite the contrary is at least

---

3. When asked what he had done after he had left for Texas, he answered:

"Q. Did you have employment in Texas?

A. I had that electronic ability so I wasn't worried; I had ten years experience in electronics and radio. Allwood seven years and Fisher Scientific, working in electronics. Oh, I had enough ability about electronics, as far as that is concerned." (N.T. 23)

Beyond this, he never answered the question. When asked about his employment upon returning from Texas, he replied that (evidently for about a year) he was an electronics technician "at Ocean Energy in Blairsville." (N.T. 17)

suggested by the record. The mother is not employed and spends all her time at home with David and Paula. The father is (evidently at least to some extent) in business for himself. His wife is employed as a beautician; she testified that she is "off Monday and Wednesday ... and half day Saturday [and presumably also Sunday]." (N.T. 33.) The father's mother testified that she lives with her husband, who is retired, near her son, who "could bring [David] to me if he had to go any place." (N.T. 35.) Thus, as compared with being cared for on a full-time basis by his mother, David would be cared for on a part-time basis by one of three or four adults — his father, stepmother, grandmother, and grandfather.

There has been increasing attention, both by the courts and in the psychiatric and psychological literature, to the importance in custody cases involving young children of not disrupting an established relationship. An early and famous case is *Painter v. Bannister*, 258 Iowa 1390, 140 N.W. 2d 152 (1966). There, after consideration of testimony by a child psychologist, the court concluded to deny a father's petition for custody of his seven year old son, leaving the boy with his maternal grandparents, with whom the boy had been living for the past several years. It was the psychologist's opinion, accepted by the court, that the boy's critical need for the time being was stability, and that later, when he had better control over his environment, he could more easily adjust to change. (In fact, after a few years the boy was reunited with his father, without objection from his grandparents. *See* M. Paulsen, W. Wadlington, J. Goshel, Domestic Relations 582 (1974)). Another particularly thoughtful case is *In re Adoption of Tachick*, 60 Wis. 2d 540, 210 N.W. 2d 865 (1973). There, the question was whether it was in the best interests of the child that she should be adopted by her grandparents. The opinion contains many references to the literature on "the problem of separation trauma of a young child," and is notable for its discussion of how in

determining the child's best interests a court must give the closest attention to the psychological impact of disturbing the child's environment. *See also*, J. Goldstein, A. Freud, A. Solnit, Beyond the Best Interests of the Child, especially at 40-52 ("Placement Decisions Should Reflect the Child's, Not the Adult's, Sense of Time") (1973).

In the present case, at the time of the custody hearing David had been under his mother's care since his birth. His father had deserted him in February of 1971, when he was just a few days over three years old. In his father's absence he developed a familial relationship with Clawson and little Paula. There is nothing in the hearing judge's opinion to suggest that any attention was given to the impact on David of disrupting this environment.

The only reference in the opinion to David's feelings, or personality, is the following statement:

> "David has had some trouble in school although he is reported by both his father and mother to be a bright boy but seemingly a disturbed boy.
> "This Court from its experience as a Court and from other experience the Court knows about, can easily recognize why a child would be disturbed under the present situation.
> "When David is with his father he also has an opportunity to visit with his paternal grandfather and grandmother who live a short distance away from the father's home and they are very happy to have the boy with them if David's father and mother [*sic;* 'stepmother' no doubt intended] would happen to be away from their home for a short time. When David is visiting with his father on Sunday, he goes to church. The father testified that when David is with his father and he is to be returned to his mother, he cries and says he does not want to go back home."

Two observations may be made regarding this statement. The first observation is that the statement cannot

qualify as the "comprehensive" and "thorough" statement required by *Commonwealth ex rel. Ulmer v. Ulmer, supra, Augustine v. Augustine, supra,* and *Commonwealth ex rel. Grillo v. Shuster, supra.* To the contrary, when measured against the record it appears selective and other than impartial. A stepmother who works three and a half days a week does not "happen to be away from ... home for a short time." Moreover, David's father and stepmother do not themselves go to church. When asked by the hearing judge, "Are you affiliated with a church?" the father replied:

> "David goes to church every Sunday. We *were going to go* to a church. Our neighbor over there can vouch for it, *he goes with her boy."* (N.T. 28; emphasis added).

Also, the mother testified that "[w]hen [David] was with us he went to church every Sunday." (N.T. 8.) She went on to say that since David had been with his father on weekends, she had not taken him to church.

The second observation is that it is evident that the statement, "the Court ... can easily recognize why a child would be disturbed under the present situation," refers to the non-marital relationship of David's mother and Clawson. There is, however, nothing in the record to suggest that this relationship disturbs David. It seems far more likely that to whatever extent David is in fact "disturbed," it is because he feels himself caught between his parents. It is not unusual in custody cases to discern a desire by the parents to hurt each other, and to use the child to do so. Certainly there is a suggestion of this in the present case as regards the father. His attitude towards the mother's relationship with Clawson hardly befits one who left his wife evidently to live with another woman for over two and a half years before getting a divorce. Also, while he may indeed love David, he left David for over three years, and his financial contribution towards David's support has hardly been substantial.

## III

Three times we have said that we will not permit a child's future to be disposed of in summary fashion. *Commonwealth ex rel. Ulmer v. Ulmer, supra; Augustine v. Augustine, supra; Commonwealth ex rel. Grillo v. Shuster, supra.* Unhappily, here we must say it again.

The entire record in the present case consists of forty one pages; it seems unlikely that the hearing took much over one hour. The deficiencies in the testimony have been referred to above. Aggravating these deficiencies is the fact that there is not one word of disinterested testimony. (Not even the interested testimony was complete; Clawson was not called.) No one, such as a social worker for the court, inspected the mother's and father's respective residences, and described them to the court; or confirmed the mother's testimony about having rented another residence; or confirmed the father's business, or Clawson's employment. No one from David's school, or church, testified. No psychologist or psychiatrist examined David, or the mother and father, or the relationship between the mother and Clawson, or between the father and his present wife.

The cases that come before this court may be said to concern money, crime, or children. Of these, it is only in those that concern our children that we bank our all on the future. The child is only setting out on life, and we believe that if we try, we can provide some protection against life's storms. We abandon that belief when we dispose of a petition for custody in the summary fashion illustrated by this case. Instead of trying to shape the future by study of facts, we surrender the child to chance. Surrender does not become the law.

The order of the lower court is set aside, and the record is remanded with a *procedendo*.

VAN DER VOORT, J., concurs in the result.

PRICE, J., dissents.