ing leniency.[2] *See Champney, supra.*

¶ 10 Affirmed.

**N.H.M., Appellant**

v.

**P.O.T., Appellee.**

Superior Court of Pennsylvania.

Argued March 18, 2008.

Filed April 30, 2008.

---

John W. Frommer III, Harrisburg, for appellant.

P.O.T., appellee, pro se.

BEFORE: STEVENS, LALLY–GREEN, and FITZGERALD *, JJ.

OPINION BY STEVENS, J.:

¶ 1 N.H.M. ("Mother") appeals from the August 23, 2007 order of the Court of Common Pleas of Dauphin County awarding primary physical custody of the parties' minor children, G.M.T., a male, and H.M.T., a female, (collectively "the children") to P.O.T. ("Father"). We affirm.

¶ 2 The relevant facts and procedural history, as gleaned from the record, are as follows: Mother and Father are the natural parents of G.M.T. (D.O.B. 2/11/1996) and H.M.T. (D.O.B. 1/2/1997). Mother and Father lived in California with the children until January 10, 2000, at which time Mother and the children relocated to the home of Mother's parents in Clinton County, Pennsylvania. By order dated Decem-

---

* Former Justice specially assigned to the Superior Court.

ber 11, 2000, Mother was awarded primary physical and legal custody of the children. To date, Father continues to reside in Hayward, California and lives with his mother. Over the years, the children have spent Christmas vacation as well as summer vacation with Father in California. In June of 2004, Mother moved with the children to the home of her paramour, S.R., and his son, C.R., who is six months older than G.M.T. S.R.'s home is located in Dauphin County, Pennsylvania.

¶ 3 In August of 2006, while visiting Father in California, G.M.T. informed Father that, on approximately thirty occasions over the past two years, beginning when he was eight years old, he had been sexually assaulted by C.R. Thereafter, Father filed a petition in Alameda County, California for temporary emergency custody of the children. Father's petition was dismissed, and the court directed that Father return the children to Pennsylvania. In the interim, on August 24, 2006, Mother filed a petition for contempt against Father in Clinton County, Pennsylvania, in which she alleged that Father failed to return the children from summer visitation. Mother's petition was likewise dismissed by the trial court because the children had resided for more than six months in Dauphin County, Pennsylvania. As a result, by order dated September 6, 2006, the Clinton County trial court transferred the instant custody action to Dauphin County.

¶ 4 Father returned the children to Mother per the Alameda County court order. On December 18, 2006, Father filed a petition for modification of custody in Dauphin County, Pennsylvania, in which he requested primary physical custody of the children.[1] Thereafter, three custody conciliation conferences occurred in Dauphin County, one in January, February, and May of 2007. Father personally attended the first two conferences, and he participated by telephone at the third conciliation conference. By temporary custody order dated February 26, 2007, Mother and Father were granted shared legal custody, and Father was given partial physical custody. Thereafter, Father filed a "petition for special relief ex parte," in which he again requested primary physical custody of the children.

¶ 5 A custody hearing followed on June 25, 2007. Upon agreement between Mother's counsel and Father, the trial court interviewed the children separately without counsel present and without a court reporter. By order entered on August 23, 2007, the trial court awarded Father primary physical custody of the children. In addition, the order granted Mother visitation as follows: (1) one-half of the Christmas holiday; (2) a continuous two-week period during the summer; (3) the entire Easter vacation; (4) liberal visitation should she visit California; and (5) any other visitation agreed to by the parties. Further, the custody order directed that, when visiting Mother, the children "shall not be left unsupervised with [C.R.]," nor share a bedroom with C.R.

¶ 6 Mother filed a timely notice of appeal on September 6, 2007. On September 12, 2007, the trial court ordered Mother to file a concise statement of matters complained of on appeal within fourteen days, pursuant to Pa.R.A.P.1925(b), and Mother timely complied.

---

1. Father proceeded *pro se* in the custody action. Likewise, he proceeds *pro se* before this Court.

¶ 7 On appeal, Mother raises the following issues:

1. WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT AWARDING PRIMARY PHYSICAL CUSTODY OF BOTH CHILDREN TO FATHER WAS IN THEIR BEST INTERESTS, CONSIDERING THE PARTIES' HISTORICAL INVOLVEMENT IN THE CHILDREN'S LIVES, THEIR PARENTING HISTORIES, AND THEIR RESPECTIVE LIVING ARRANGEMENTS.

2. WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT AWARDING FATHER PRIMARY PHYSICAL CUSTODY OF THE CHILDREN WAS IN THE CHILDREN'S BEST INTEREST AFTER CONDUCTING AN OFF–THE–RECORD INTERVIEW WITH THE CHILDREN. FURTHER, THE COURT APPEARS TO HAVE BASED ITS [SIC] DECISION TO TRANSFER FULL CUSTODY FROM MOTHER TO FATHER ENTIRELY ON THAT INTERVIEW.

3. WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT AWARDING FATHER PRIMARY PHYSICAL CUSTODY OF THE CHILDREN WAS IN THE CHILDREN'S BEST INTEREST BY GIVING UNDUE WEIGHT TO THE CHILDREN'S ALLEGED PREFERENCE TO LIVE WITH THEIR FATHER.

4. WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT AWARDING FATHER PRIMARY PHYSICAL CUSTODY OF THE CHILDREN WITHOUT FIRST ORDERING A CUSTODY EVALUATION WAS IN THE CHILDREN'S BEST INTEREST.

5. WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT REALISTIC VISITATION ARRANGEMENTS EXIST WHICH WILL FOSTER THE ONGOING RELATIONSHIP BETWEEN MOTHER AND HER SON AND DAUGHTER.

Mother's brief at 5.

 ¶ 8 We conduct our review according to the following standard:

Our paramount concern and the polestar of our analysis in this case, and a legion of prior custody cases is the best interests of the child. The best interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral and spiritual wellbeing. On appeal, our scope of review is broad in that we are not bound by deductions and inferences drawn by the trial court from the facts found, nor are we required to accept findings which are wholly without support in the record. On the other hand, our broad scope of review does not authorize us to nullify the fact-finding function of the trial court in order to substitute our judgment for that of the trial court. Rather, we are bound by findings supported in the record, and may reject conclusions drawn by the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

Further, on the issues of credibility and weight of the evidence, we defer to the findings [of] the trial judge. Additionally, appellate interference is allowed only where it is found that the custody order is manifestly unreasonable as shown by the evidence of record.

*Saintz v. Rinker,* 902 A.2d 509, 512 (Pa.Super.2006) (quotation omitted). Moreover,

"[i]n a custody action, the particular circumstances of the case must be considered. Each case is to be decided on its own individual facts." *E.A.L. v. L.J.W.*, 443 Pa.Super. 573, 662 A.2d 1109, 1118 (1995) (citation omitted). Unless the trial court's ruling represents a gross abuse of discretion, an appellate court will not interfere with its order awarding custody. *See id.*

¶ 9 The crux of Mother's arguments with regard to her second, third, and fourth issues is that the record is insufficient for this Court to conduct a proper review. Accordingly, we begin our review with those three issues and discuss them together as follows.

■ ¶ 10 Mother contends that the trial court's interview of the children should have been transcribed. Without a transcript, Mother contends that the record fails to support the trial court's conclusion that the children's best interests are served by awarding Father primary physical custody. We disagree.

¶ 11 In support of her argument, Mother relies on *Gunter v. Gunter*, 240 Pa.Super. 382, 361 A.2d 307 (1976) *(en banc)*, in which this Court reversed an order transferring custody of the child from his mother to his father. In *Gunter*, the trial court conducted an interview in chambers with the child. The trial court permitted counsel to be present and to question the child, but failed to direct that a transcript of the child's interview be made. In transferring custody to the father, the trial court relied on the child's statement that he would prefer to be with his father. We concluded that, without a transcript, the record was insufficient for us to determine whether the child's best interests had been served. As will be discussed below, in contrast to the situation in *Gunter*, the record evidence in this case sufficiently supports the trial court's determination that the children's best interests will be served by transferring primary physical custody to Father. Therefore, *Gunter, supra,* is not controlling this matter.

¶ 12 Instantly, in its Rule 1925(a) opinion, the trial court stated that it conducted an "exhaustive examination of all factors pertaining to the children's best interests.... Ultimately, it was [G.M.T.'s] need to heal from the sexual issues that dictated a decision to award primary physical custody to Father." Trial Court Opinion, 12/27/07, at 4.

¶ 13 The trial court summarized on the record the conversation, which transpired with the children in chambers. Initially, the court stated that it observed a strong connection between the children. N.T., 6/25/07, at 104–105. Therefore, the court concluded that the children needed to stay together.[2] *Id.* at 105. The trial court continued that H.M.T. "is of the opinion something happened to [G.M.T.]. What it is, she doesn't know." *Id.* at 107. As for [G.M.T.], the trial court stated that it did not ask him specific questions about the alleged sexual acts because it "didn't need to." *Id.* Rather, the trial court stated that out of a conversation with G.M.T. regarding football, "came the answer." The court continued,

---

2. We note the policy of this Commonwealth that siblings should be raised together absent "compelling reasons" to the contrary. *L.F.F. v. P.R.F.*, 828 A.2d 1148, 1152 (Pa.Super.2003). Nevertheless, Mother fails to argue that the children should not be raised together, and our review of the record fails to reveal any compelling reasons why they should not remain together.

[G.M.T.] became somewhat emotional. And we had a roundabout discussion of things and perceptions and his feelings which I felt were more important than the act themselves.

It's how he looked at himself, it's how he has internalized it, without being spoken.... [G.M.T.] deep down is having a real hard time with this—with this situation.

I don't necessarily believe it was as extreme and criminal as one would argue, but I think for his own psyche and wellbeing he's got to have a change of pace. He's crying out for it. [H.M.T.] is crying out for it for him....

[T]he bottom line for me is [G.M.T.]. And by being with Dad, it will give him a calm and will help him get through it so that he can heal from it, whether it was his own actions or not actually.

And the more I think, Dad, you can work through this with this young man. And rather than rehashing it—you take this anyway you want, but the incident's [sic] got to die here for everybody. It's got to die here. I think [G.M.T.] wants it to die. He wants to leave it and move on.

*Id.* at 112, 115–116.

¶ 14 The record evidence supports the trial court's finding that inappropriate sexual contact occurred between G.M.T. and C.R. which has caused G.M.T. emotional harm. Father testified at the custody hearing that, while the children were visiting him in California in August of 2006, Father and G.M.T., who was ten years old at the time, were watching a film that mentioned the subject of AIDS. N.T., 6/25/07, at 10. Father continued, "[G.M.T.] asked me what AIDS was. I told him. Immediately he began to shake and cry repeating, I don't want to die, can you save me, what should I do, what should I do...." *Id.* at 10–11. Father testified that G.M.T. revealed two or three instances of homosexual sex between him and C.R., in addition to oral sex, fondling, and watching sex on the internet with C.R. *Id.* at 11–12. In total, G.M.T. related thirty sexual incidents to Father "spanning a two-year period." *Id.*

¶ 15 Father stated that he learned from G.M.T. that Mother and her paramour, S.R., had found C.R. "mimicking sexual behavior five to six times." *Id.* G.M.T. told Father that the inappropriate sexual contact between him and C.R. occurred while Mother was at home as well as away from home. *Id.* Father testified that G.M.T. told him that he would try to stay away from C.R., but it was difficult because they lived in the same house. *Id.* at 13. Father related that, as G.M.T. explained, "[C.R.] would somehow trick [G.M.T.] and the sex would begin again." *Id.* at 14. Father testified that G.M.T. told him that C.R. had a pocket knife with which he would threaten the children. *Id.* Finally, Father stated that he related to Mother all that G.M.T. told him. Mother then questioned G.M.T. on the telephone, at which point G.M.T. "sobbed uncontrollably and said he wasn't safe at [S.R.'s] house...." *Id.* at 15. G.M.T. told Mother that, if she made him go back to S.R.'s house, he would kill himself. *Id.* at 16.

¶ 16 The children's paternal grandmother, who lives with Father, testified that she asked G.M.T. to tell her what had happened between him and C.R. "[H]e found it very, very difficult to discuss it." *Id.* at 33. She testified that, G.M.T., while sobbing, described instances of homosexual and oral sex. *Id.* The paternal grandmother stated that G.M.T. told her that

C.R. had a knife. "He would take it out of his pocket and show it to him and insist that he would do these things." *Id.* She testified that G.M.T. said he would "kill himself" if he had to go back to S.R.'s house. *Id.*

¶ 17 In addition, Mother testified at the custody hearing that she was aware of "sexual exploration" between G.M.T. and C.R. *Id.* at 46. She stated,

> I was aware that the boys were experimenting, playing doctor. . . .
>
> That consisted of a lot of giggling and under blankets and just typical stuff that—checking out sizes and differences. [G.M.T.] was not circumcised. His penis does look different than [C.R.'s].
>
> But each and every time which was probably three times on my part, I said, boys, that's enough, find something else to do leave the room, let's go.

*Id.* at 54. Mother testified that she was not aware of the extent of the sexual activities as related to Father by G.M.T. *Id.* at 54–55. In addition, Mother does not believe that G.M.T. has lied about the sexual incidents. *Id.* at 46.

¶ 18 Mother testified that, once the children were returned to Pennsylvania, she moved out of S.R.'s house with the children for one month. *Id.* at 47. Mother testified that she and the children moved back to S.R.'s home because G.M.T. requested it. Mother testified that, to ensure that inappropriate sexual contact did not occur again, she required the bedroom doors of the children and C.R. to stay open "unless they are in their rooms by themselves and want privacy." *Id.* at 56–57.[3]

¶ 19 S.R. testified at the custody hearing that, before G.M.T. told Father about the sexual incidents between him and C.R., S.R. had caught the boys in "some form of exploration." *Id.* at 89–90. He stated,

> Prior to any of these allegations, I had instructed the boys that any form of sexual contact was inappropriate and wouldn't be tolerated. . . . I didn't observe anything specific the boys were doing other than a couple of times I caught them in a room giggling. I'd say, what's going on with you guys. It appeared that there was some form of exploration.

*Id.*

¶ 20 Finally, Frank Resek, a family based therapist employed by Keystone Children and Family Services, testified at the custody hearing. Beginning in November of 2006, Mr. Resek or another therapist from his office, met with Mother, the children, S.R., and C.R. at least two times a week for thirty-two weeks with regard to issues of conflict in the home. *Id.* at 70–71, 74. Mr. Resek offered no opinion on G.M.T.'s sexual misconduct allegations because he was not retained to investigate that issue. *Id.* at 78, 87. Mr. Resek testified that he diagnosed G.M.T. with an adjustment disorder with disturbance of mood disorder. *Id.* at 81. Likewise, he testified that H.M.T. has a diagnosis as well, although he could not recall what it was during his testimony. *Id.* at 81. Mr. Resek proposed a treatment plan for the children in which he recommended that they be treated individually by a mobile therapist to help them with their ad-

---

3. Mother also testified that, upon learning of the inappropriate sexual acts between G.M.T. and C.R. as related to Father, she contacted Children and Youth in Dauphin County which offered assistance in assuring G.M.T.'s safety as well as providing counseling. *Id.* at 51–52; Respondent's Exhibit 1. Thereafter, the children participated in counseling and were discharged after one month. *Id.* at 55–56.

justment to a blended family. *Id.* at 82. In addition, Mr. Resek testified that the children attend a summer therapeutic activities program.[4] *Id.* at 82.

¶ 21 As such, competent record evidence supports the trial court's conclusion that inappropriate sexual contact occurred between G.M.T. and C.R. which has caused emotional disturbance to G.M.T. As a result, even without a transcript of the trial court's interview with the children, the record sufficiently enables this Court to conclude that the order transferring primary physical custody to Father is not an abuse of discretion. Accordingly, Mother's claim fails.

■ ¶ 22 Further, it follows that Mother's contention that the trial court gave undue weight to the children's preference to live with Father is without merit. Rather, the trial court's decision was based on observations of G.M.T.'s emotional disturbance as a result of inappropriate sexual incidents with C.R. Moreover, the trial court's observations are independently supported by competent record evidence. Therefore, this claim fails.

■ ¶ 23 Mother also contends that the record is incomplete for failing to include a custody evaluation. Mother contends that a custody evaluation was necessary to determine (1) the veracity of the sexual allegations and (2) the suitability of Father's living conditions. Mother's brief at 25. At the completion of Mother's case at the custody hearing, Mother's counsel stated, "For the record there is, Your Honor, no custody evaluation performed in this case. For the record I would move, if the Court

deems it necessary, to continue the case for a custody evaluation." *Id.* at 99. The trial court responded, "No. I don't see the need." *Id.* We agree with the trial court that a custody evaluation was not necessary in this matter.

¶ 24 As discussed above, both Mother and S.R. testified that they observed sexual activities between G.M.T. and C.R. on more than one occasion. The record also demonstrates that G.M.T. is emotionally distraught over the incidents. Although the trial court remained unconvinced with regard to the extent of the misconduct and the level of willingness of G.M.T. to participate in it, we deem this information irrelevant to a determination of the best custody arrangement for the children. As such, we conclude that a custody evaluation was unnecessary in this regard.

¶ 25 Likewise, a custody evaluation was not necessary to determine the suitability of Father's living conditions. The record reveals that Father lives with his mother in a "very nice showroom mobile home" with three bedrooms. N.T., 6/25/07, at 27. Father testified that he lives on "family resources" which are sufficient to support the children. *Id.* at 29. Moreover, Father testified that he plans to build a house in Nevada for him, the children, and his mother. *Id.* at 105–106.

¶ 26 In support of her argument, Mother relies on *Gunter, supra,* wherein we stated the governing principle that "we will not permit a child's future to be disposed of in summary fashion." *Gunter,* 361 A.2d at 317. In *Gunter,* the child was seven years old. Based on nothing more than the child's preference, the trial court trans-

---

4. Mother testified that they completed working with Mr. Resek shortly before the custody hearing. As a result of Mr. Resek's proposed treatment plan, Mother testified that H.M.T. would be seeing a therapist twice per month, and G.M.T. was on a waiting list to receive a therapist. *Id.* at 64–65.

ferred custody from the child's mother, with whom he had lived his entire life, to his father. We concluded that there was no competent evidence to support the court's finding that the child would prefer to be with his father. In addition, we concluded that the record lacked competent evidence to suggest that the father's living situation was any more stable than that of the mother which would justify transferring custody. As a result, we held that an independent custody evaluation was necessary.

¶ 27 Mother also cites to *E.A.L.*, *supra*, in which this Court vacated an order awarding primary physical custody to the mother. In *E.A.L.*, the children resided with their maternal grandparents from birth to ages nine and eleven, respectively. We concluded that the trial court failed to consider, *inter alia*, the children's long standing residence with their grandparents, and the effect on them of an abrupt and unplanned transition to their mother's home. We concluded that, in order to develop a complete record, the trial court needed competent expert testimony to assist it in determining the effect of the transfer of custody on the children.

¶ 28 Finally, Mother relies on *English v. English*, 322 Pa.Super. 234, 469 A.2d 270 (1983), and *Ashford v. Ashford*, 395 Pa.Super. 125, 576 A.2d 1076 (1990). In *English*, we concluded that the record was inadequate for failure to include disinterested testimony regarding the fitness of each parent's home, as well as the trial court's failure to discuss the possible effect on the child of the proposed custody transfer. In *Ashford*, we stated it "would have been desirable" for the court to have an appraisal of the home environment due to allegations that the child was sleeping on a "stinking" couch and sometimes on the floor in the mother's home. *Ashford*, 576 A.2d at 1080–1081.

¶ 29 Unlike the cases cited by Mother, the present matter is not a case where the children's future was disposed of "in summary fashion." As discussed above, competent record evidence supports the trial court's determination that the children's best interest lay in awarding Father primary physical custody. Therefore, Mother's claim that a custody evaluation was necessary is without merit.

¶ 30 We next turn our attention to Mother's first issue, which is interrelated to the above discussion. Mother contends that the trial court erred in transferring primary physical custody considering the parties' historical involvement in the children's lives, their parenting histories, and their respective living arrangements. Specifically, Mother contends that she should have primary physical custody because S.R.'s house is more adequate than Father's house, and she has been involved in the children's education over the course of their lives. We disagree.

¶ 31 The trial court stated that both Mother and Father possess positive and negative factors as parents; however, it was G.M.T.'s need to heal from the inappropriate sexual activities, and that this need would best be met by living with Father, that dictated the court's decision to transfer custody. We will not disturb the trial court's order which is reasonable in light of the evidence. Indeed, G.M.T.'s emotional, psychological, and physical well-being are at stake, and Mother's parenting history and housing situation are of little consequence to G.M.T.'s needs in this regard. As such, Mother's claim fails.

¶ 32 In her fifth and final issue, Mother contends that the trial court's or-

der will not foster an ongoing relationship between her and the children.[5] Mother also contends that the trial court erred in awarding Father primary physical custody because Father will fail to encourage the children's relationship with Mother.

¶ 33 Mother relies on our General Assembly's declaration that,

it is the public policy of this Commonwealth, when in the best interest of the child, to assure a reasonable and continuing contact of the child with both parents after a separation or dissolution of the marriage and the sharing of the rights and responsibilities of child rearing by both parents....

23 Pa.C.S.A. § 5301. Mother contends that the custody order violates public policy by precluding her from having "reasonable and continuing contact" with the children. Upon careful review of the record, we conclude that the trial court's order affords Mother reasonable and continuing contact with the children under the circumstances. The order protects the children's best interests by allowing them to maintain a relationship with Mother while at the same time affording them a safe and stable environment with Father. Accordingly, we will not disturb the trial court's order on this basis.

■■■ ¶ 34 With regard to Mother's contention that Father will not encourage the children's relationship with her, Mother cites the proposition that "one of the factors warranting a change of primary physical custody from one parent to another is the custodial parent's willingness to cooperate in encouraging the children's relationship with the non-custodial parent." *L.F.F. v. P.R.F.*, 828 A.2d 1148, 1152 (Pa.Super.2003). As such, Mother contends that Father "has a history of being manipulative and uncooperative with Mother and state authorities." Mother's brief at 28. We conclude that Mother's contentions are without merit. Indeed, our review of the record indicates that, in seeking the best interests of his children, Father has cooperated with court orders, as well as state authorities, in both California and Pennsylvania. Father has pursued primary physical custody of his children under the laws of this Commonwealth, and we find no evidence that he will hinder the children's relationship with Mother. Therefore, Mother's claim fails.

¶ 35 Accordingly, we conclude that the custody order is reasonable in light of the record evidence and the trial court did not abuse its discretion.

¶ 36 Order affirmed.

■■■

---

5. We note that Mother's argument echoes, in part, the third factor outlined in *Gruber v. Gruber*, 400 Pa.Super. 174, 583 A.2d 434, 439 (1990), which, in permitting the primary custodian's relocation, considers the "availability of realistic, substitute visitation arrangements which will adequately foster an ongoing relationship between the child and the non-custo-dial parent." *See Landis v. Landis*, 869 A.2d 1003, 1011 (Pa.Super.2005) (stating that in a custody case involving relocation, the *Gruber* factors must be considered and applied "under the umbrella of the ultimate objective of determining the best interests of the child") (citation omitted).