J-A20005-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| E.E.H. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| C.D.H. | : | |
| | : | |
| | : | |
| APPEAL OF: E.E.H. | | No. 426 MDA 2017 |

Appeal from the Order Entered February 9, 2017
In the Court of Common Pleas of Lancaster County
Civil Division at No(s):  CI-13-01719

BEFORE:   GANTMAN, P.J., PANELLA, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY GANTMAN, P.J.:                **FILED AUGUST 11, 2017**

Appellant, E.E.H. ("Father"), appeals from the order entered in the Lancaster County Court of Common Pleas, which granted Appellee C.D.H. ("Mother") sole legal and physical custody of the parties' minor child ("Child") (born in 2008) and suspended Father's contact with Child.  We affirm.

In its opinions filed February 9, 2017 and April 10, 2017, the trial court accurately set forth the relevant facts and procedural history of this case. Therefore, we have no reason to restate them.

Father raises two issues for our review:

> WHETHER THE [TRIAL] COURT ERRED IN ITS APPLICATION OF THE FACTORS CONTAINED IN 23 PA.C.S.A. § 5328 IN DETERMINING THE BEST INTERESTS OF THE CHILD INVOLVED ARE MET BY SUSPENDING ALL CONTACT, EXCEPT MAIL, BETWEEN CHILD AND HER FATHER.

WHETHER THE EVIDENCE SUPPORTS A REASONABLE CONCLUSION [ON] THE PART OF THE [TRIAL] COURT THAT [FATHER] HAS CONDUCTED HIMSELF WITH HIS DAUGHTER IN SUCH A WAY AS TO CAUSE HER TO BE FEARFUL OF HIM TO THE DEGREE THAT CONTACT WOULD BE HARMFUL TO HER.

(Father's Brief at 6).

In reviewing a child custody order:

[O]ur scope is of the broadest type and our standard is abuse of discretion. This Court must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, this Court must defer to the trial judge who presided over the proceedings and thus viewed the witnesses first hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*S.J.S. v. M.J.S.*, 76 A.3d 541, 547-48 (Pa.Super. 2013) (internal citation omitted).

As a preliminary matter, appellate briefs and reproduced records must materially conform to the requirements of the Pennsylvania Rules of Appellate Procedure. Pa.R.A.P. 2101. The rules of appellate procedure mandate that an appellant's brief **shall** consist of distinct components. *See* Pa.R.A.P. 2111(a). *See also* Pa.R.A.P. 2114-2135 (addressing specific requirements for each subsection of brief on appeal). This Court may quash or dismiss an appeal if the appellant's brief does not conform to the

applicable rules. *In re Ullman*, 995 A.2d 1207, 1211-12 (Pa.Super. 2010), *appeal denied*, 610 Pa. 600, 20 A.3d 489 (2011).

Similarly, when an appellant fails to raise or develop his issues on appeal properly, or where his brief is wholly inadequate to present specific issues for review, this Court can decline to address the appellant's claims on the merits. *Butler v. Illes*, 747 A.2d 943 (Pa.Super. 2000). *See also Lackner v. Glosser*, 892 A.2d 21 (Pa.Super. 2006) (explaining arguments must adhere to rules of appellate procedure and arguments which are not appropriately developed are waived on appeal; arguments not appropriately developed include those where party has failed to cite authority in support of contention); *Estate of Haiko v. McGinley*, 799 A.2d 155 (Pa.Super. 2002) (stating appellant must support each question raised by discussion and analysis of pertinent authority; absent reasoned discussion of law in appellate brief, appellant hampers this Court's review and risks waiver on appeal).

Instantly, Father's brief fails to conform to the requirements of an appellate brief. Father presents two issues in his statement of questions presented but combines his issues into one argument section, in contravention of Rule 2119. *See* Pa.R.A.P. 2119 (stating: "The argument shall be divided into as many parts as there are questions to be argued; and shall have at head of each part—in distinctive type or in type distinctively displayed—particular point treated therein, followed by such discussion and

citation of authorities as are deemed pertinent"). Father's entire brief is also single-spaced. *See* Pa.R.A.P. 124(a)(3) (explaining text of appellate brief must be double-spaced except for quotations more than two lines long and footnotes). Significantly, Father cites virtually no law to support his complaints on appeal, cites only two cases in his argument section, and discusses neither in any detail. Although he mentions the relevant custody statute (*see* 23 Pa.C.S.A. § 5328(a)), Father fails to discuss the custody factors with any specificity and ignores certain factors which the court found particularly relevant.[1] (*See* Father's Brief at 14). The defects in Father's brief constitute waiver of his claims on appeal. *See Lackner, supra*; *Estate of Haiko, supra*; *Butler, supra*.

Moreover, even if Father had properly preserved his issues for our review, his claims would merit no relief. The opinions of the Honorable Leonard G. Brown, III, comprehensively discuss and properly dispose of the questions presented. (*See* Opinion in Support of Order, filed February 9, 2017, at 12-17) (examining each factor under applicable custody statute; concluding award of sole legal and physical custody of Child to Mother is in Child's best interest); and (Trial Court Opinion, filed April 10, 2017, at 16-18) (finding: **(1)** court heard multiple days of testimony and analyzed each of statutory factors under Section 5328(a); based on testimony and

---

[1] The court stated it found factors eight, nine, and fifteen particularly relevant. Father does not even mention factors eight and nine.

evidence presented, court found Father is unable at present time to form nurturing relationship with Child or care for Child's emotional needs; more troubling to court was extent and nature of Father's mental health; Father's psychologist conceded Father's personality disorder poses danger to Child's emotional wellbeing, Child should be older and more mature before relating with Father; **(2)** custody order permits Father to send cards and gifts to Child; but court awarded Mother sole physical custody of Child because Father suffers from personality disorder; any contact between Father and Child would burden Child significantly given her age, emotional state, and immaturity; both psychologists testified that even supervised custody would be detrimental to Child at this time;[2] court's order allowed for reevaluation after Child's twelfth birthday, to determine if she can reunify with Father).  If Father had properly preserved his claims, we would affirm on the basis of the trial court's opinions.

Order affirmed.  Case is stricken from argument list.

---

[2] The record shows Child fears Father.  Father wants Child to be Muslim and has held Child's head to the floor to make her pray.  Father also drove fast with Child in the car before she was buckled properly, disapproved of Child's use of her left hand even though Child is left-handed, licked Child's face, doused Child in perfume she did not want to wear, and asked Child to spank Father with a toy bowling pin "harder and harder."

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>8/11/2017</u>

Circ**ENTERED AND FILED**:50 AM
**PROTHONOTARY'S OFFICE**
**LANCASTER, PA**
***Electronically Filed****
**Feb 09 2017 4:37 PM**

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
CIVIL ACTION - LAW

E. H. "Father"
    Plaintiff,

    v.

C. H. "Mother"
    Defendant.

No. CI-13-01719

## OPINION

This case is before the court on petitions for special relief filed by both parties. Following multiple hearings, conference calls, and presentations over one year and four months, this matter is ripe for review. After consideration of all the evidence, the court reaches an unprecedented conclusion for it: the custody rights of Father must be indefinitely suspended.

### I.    PROCEDURAL HISTORY

The court last entered a final order in this matter on November 12, 2014. Unfortunately, events had already occurred which eclipsed that order. These events would eventually lead to the suspension of Plaintiff's contact with the Child and bring the parties into court multiple times over the next two years.

To briefly recount the procedural history prior to the court's November 2014 order: this case began when Plaintiff,       E. H.       ("Father"), filed a complaint in custody on May 8, 2013, against Defendant     C. H.       ("Mother"). Following two continuances by agreement, the court held a hearing on June 10, 2014. Due to insufficient time to complete the testimony, the court held a second day on October 9, 2014. Both parties attended both days with counsel. The testimony was completed on the second day, and the court issued its November 12, 2014 order. That order granted shared legal custody and granted Mother primary custody. Until

November 2015, the content of Father's periods of custody, and whether they were supervised or

PURSUANT TO PA R.C.P. NO. 236
NOTIFICATION - THE ATTACHED DOCUMENT
HAS BEEN FILED IN THIS CASE
PROTHONOTARY OF LANCASTER CO., PA
Feb 09 2017 4:37 PM

1

53

unsupervised, was to be determined by the Child's counselor, but Father was not to have less than twenty hours per week. After June 1, 2015, Father was to have partial unsupervised custody every other Friday and Saturday—but not overnight—and one weekday evening per week.

On November 17, 2014, a mere four days after the entry of the court's order, Mother filed a petition for special relief. This petition was denied without prejudice. Mother refiled her petition on February 23, 2015, and Father filed a petition for special relief on the same day. Those petitions, filed almost two years ago, bring this case again before the court.

The court entered its own order on February 23, 2015, setting a hearing, appointing Lisa McCoy, Esq. ("GAL") as guardian *ad litem*, and suspending Father's contact with the Child. The hearing was twice continued by agreement of the parties and not held until September 4, 2015. In the interim, Father's counsel filed a petition on withdraw, as Father was not paying for services. This request was granted. The Guardian filed a report prior to the hearing. Father attended the September 4, 2015, hearing *pro se*; Mother attended with counsel. Father presented two experts at this hearing, his psychological evaluator and a sexual offender treatment specialist. Following that hearing, the court issued an order on September 16, 2015, maintaining the effect of the February 23rd order and laying out of list of requirements for Father to complete prior to petitioning the court for a follow-up hearing.

On February 1, 2016, Father filed a petition to modify. The court issued an order on February 4, 2016, noting that Father should have filed a petition for follow-up rather than a petition to modify and ordering the Office of the Prothonotary to refund his fee. The court further noted that Father had not completed all the requirements outlined in the September 16, 2015, order, including the requirement that he wait at least six (6) months. The court held that it would therefore be inappropriate to schedule a follow-up hearing at the time.

2

Following this order, Father reobtained counsel, and on March 29, 2016, Father filed a petition for a follow-up hearing. The court scheduled the hearing by ordered dated March 31, 2016. The hearing was to be held on June 3, 2016. On April 14, 2016, Mother filed a petition for special relief, requesting that the court stay the proceedings in this custody action, as the Child's maternal grandparents had filed an action for termination and adoption in Orphan's Court. This request was denied by order filed on May 17, 2016. On May 2, 2016, following a telephone conference with counsel for both parties and the GAL, the court entered an order detailing its expectations for the June 3rd hearing and scheduling a second day for August 30, 2016.

The court held the hearing's second day on June 3, 2016. Both parties attended with counsel and the GAL was present. Father himself testified and again presented the testimony of a sexual offender treatment specialist. Following the hearing, the court issued an order on June 7, 2016, finding that Father had not fully complied with the September 16, 2015, order and ordering him to do so prior to the hearing's second day. On August 30, 2016, counsel for the parties and the GAL attended a telephone conference. Plaintiff's counsel made an oral motion to continue the hearing scheduled for later that day. This motion was granted, and the court issued an order that day rescheduling the third day to January 31, 2017. The GAL filed a supplemental report on January 17, 2017, and the hearing's third day was held on January 31, 2017. Both parties attended with counsel and the GAL was present. Father testified and presented the testimony of a psychological evaluator. Also testifying on Father's behalf were three co-workers. Mother offered the testimony of a psychologist who evaluated the work of the other experts and offered his own diagnosis. Also testifying was the Child's therapist and the Child herself.

3

## II.	SUMMARY OF THE FACTS

Although the court entered a final order in this matter in November 2014, certain facts occurring prior to that are essential to the larger narrative of the dispute between the parties. Father is an Egyptian immigrant and a Muslim. Mother grew up in Lancaster County, Pennsylvania, but she was born in South Korea prior to being adopted by her parents. Mother and her family are Christians. Father and Mother married in 2002 in Egypt, moved permanently to the United States in 2006, where they lived with Mother's parents, separated in 2010, and divorced in July 2013. They have one child together,　S.H.　(DOB: 4 /2008) ("Child").

At the beginning of her relationship with Father, Mother and her parents worked diligently to understand and experience Father's culture and religion. They read books, visited an imam in Lancaster County, participated in prayers, and even visited Egypt on multiple occasions. They also assisted Father in obtaining US citizenship. Following the Child's birth, Mother and Father agreed that she would be raised a Muslim, although she was exposed to both her parents' faiths.

The Child's faith became an issue once the parties separated. Father would become angry when Mother exposed the Child to the Christian faith, to the point where he once refused the leave Mother's residence during a custody exchange and Mother's family resorted to calling the police. Father also insists that the Child practice the Islamic faith. While both parents have the right to introduce his or her faith to the Child, Father appears to have done so in a manner emotionally damaging to the Child. At one point he held her head to the floor to make her say her prayers. Cultural expectations have also strained the Father-Child relationship. The Child is left-handed, but Father disapproves. In all of this, Father expresses his disapproval to the Child in

4

a manner which leaves her uncomfortable and fearful, both of Father's religion and Father himself.

Father did not have overnight periods of custody following the parties' separation in 2010, but he did have unsupervised custody. In January 2013, Mother obtained a temporary PFA order against Father and a final order was not entered until May 3, 2013. Prior to the entry of the final order, the Child had been named as a protected party and did not see her Father. In order to facilitate their reunification, the Child and Father began counseling. By the time the court entered its November 2014 order, this reunification counseling had been ongoing for one year but had proved only marginally effective. For one, the Child has an impeccable memory, which allows her to recall and relive unpleasant memories created by Father. Despite this, she had made some progress, and Father had begun exercising unsupervised custody, although the Child still displayed some reluctance to be alone with him. Father proved a greater obstacle to the counseling. He was quick to take offense at both the Child and the therapists. He would occasional become combative during sessions or simply walk out. While Father agreed that the Child needed therapy, he also expressed the opinion that her fears of him or of Islam were not due to his actions but to the undue influence of Mother and Mother's family. He either did not admit to any of the fear-inducing behaviors relayed by the Child to her therapist or argued that those behaviors were not unreasonable. Still, in November of 2014 the court ordered the parties to continue to undergo reunification counseling. The court continued to give the Child's therapist some deference, but also laid out a deadline by which Father could expect to begin exercising unsupervised custody.

On November 17, 2014, Mother filed a petition for special relief asking the court to suspend Father's contact with the Child until allegations of inappropriate sexual contract

5

between Father and the Child were investigated by Children and Youth Services. The court denied this petition without prejudice. While the court order in effect at that time gave Father no less than twenty hours with the Child, Mother withheld the Child from Father upon the recommendation of the Child's therapist.

Mother refiled her petition on February 23, 2015. In her petition, Mother alleged that in early November 2014, Father insisted the Child spank him with a toy bowling pin. Despite the fact that Children and Youth Services determined the allegations to be unfounded for sexual abuse, Mother, relying on the Child's therapists, believed this to be grooming behavior. The court's order of February 23, 2015, suspended Father's contact with the Child.

Three hearings followed, spread over two years. At the first hearing, on September 4, 2015, the court heard the testimony of two evaluators of Father, David Berk and Dr. Jonathan Gransee. Mr. Berk is a certified sexual offender treatment specialist employed by Triad Treatment Specialists, Inc. He evaluated Father for four hours, conducting the Abel Assessment of Sexual Interest. The results of this assessment were compromised, however, as Father refused to perform the slide portion of the test, citing his religious beliefs. Mr. Berk testified that while Father showed no deviate sexual interests on the completed portions of the Assessment, he did consistently underreport his anger, hostility, and ability to control those emotions. Mr. Berk recommended that Father receive therapy in coordination with psychiatric care. He expressed the opinion that Father's contact with the Child should remain suspended until he received this treatment.

Dr. Jonathan Gransee is a psychologist. He evaluated Father over one and one-half hours and conducted the MMPI Assessment. Dr. Gransee diagnosed Father with impulse control disorder. He found Father to be suffering from stress and anxiety and unable to respect

6

appropriate social boundaries with others. Dr. Gransee suggested that Father address these through therapy and anger management classes, as well as medication. He further testified that he himself had completed therapy session with Father and that Father was on medication for anxiety and depression. Dr. Gransee deferred any comment on the sexual allegations to the expert from Triad. He also refused to take a firm stance on the appropriateness of the court's suspension of Father's contact with the Child.

The court also heard from Kathrine DeStefano, the therapist directing the reunification counseling between Father and the Child. Although a licensed therapist, Ms. DeStefano testified as a fact witness, not an expert, and the court does not give weight to her opinion that Father views the Child as an object of sexual desire rather than a daughter. Ms. Destefano also testified regarding Father's behavior during their reunification sessions, that he was unable to consistently respect the Child's feelings and boundaries and that she appeared afraid of him. Father was also occasionally angry with the therapists or the office staff.

Also testifying at the September 2015 was Natalie McHenry, the Child's therapist. She testified that while she was initially supportive of the reunification between Father and the Child, she no longer holds that position. Ms. McHenry testified that despite all the therapy the Child has received, she becomes immediately afraid at the least mention of her Father. The Child had also recounted to Ms. McHenry the bowling pin incident, and Ms. McHenry expressed her opinion that this was sexual grooming behavior on the part of Father. However, like Ms. DeStefano, Ms. McHenry testified as a fact witness only, and not an expert.

The GAL also testified to add clarity to her report. She had reviewed all court documents, as well as the records of the Child, Mother, and Father. She had also spoken to the various evaluators and therapists, a supervisor at the Children and Youth Services Agency, and to several

7

experts on Egyptian culture and the Islamic religion. She testified to her observation that the Child appeared genuinely afraid of Father, especially when recounting the bowling pin incident. The GAL recommended that the current suspension of contact remain in place until Father had followed the recommendations of Dr. Gransee and Triad.

Finally, the court heard from Father's imam. The imam testified that Father is a regular participant at the mosque. He remembered Father bringing the Child to the mosque previously and thought she enjoyed it no more or less than the other children. He believed Father would be well able to care for the Child.

Following this hearing, the court issued an order on September 16, 2015, which continued the temporary suspension of contact between the Child and Father. The court further required Father to complete the following requirements:

1. Consultation with a licensed psychiatrist regarding anxiety medications.

2. Twenty therapy sessions with a licensed professional counselor.

3. Weekly participation in domestic violence or anger management support group for a minimum of six months.

4. Participation in parenting education classes or work with a private parent trainer.

5. No sooner than six months, undergo reevaluation by Triad, including the slide portion of the Abel Assessment

6. No sooner than six months, undergo reevaluation by a psychologist or psychiatrist.

Once Father completed these requirements he could petition for a follow-up hearing

At the next hearing, on June 3, 2016, the court determined that Father had not fully complied with the requirements of the September 16, 2015, order. He had complied with numbers 2 and 4 above and substantially complied with 1 and 5. Father failed to comply with 3

or 6 in that he did not participate in an anger management support group or undergo a reevaluation by a psychologist or psychiatrist. Nevertheless, the court went forward with the hearing in order to hear evidence on the requirements Father had completed.

The court heard testimony from Molly Simmons, a clinician with Triad Treatment Specialists. Ms. Simmons conducted the reevaluation of Father as ordered by the court. She admitted that Father did not wait the six months as required by the court's order, but stated that this would not affect the results of the tests. Father redid the Abel Assessment in January 2016, this time completing the slide portion of the test. The slide portion is objective in the sense that Father's reactions to the slides are measured, not self-reported. The test revealed that Father showed the most sexual interest in adult females and significant sexual interest in post-pubescent females. Father showed no significant sexual interest in pre-pubescent females.

Father also testified at the June 3rd hearing. He admitted to not fully complying with the requirements of the court's September 16th order, but testified that he was unrepresented at the time, has some difficulty with the language, and found the order confusing. Father testified that the complied with portions of the order had been helpful to him. He denied having any issues with anger or giving the Child any reason to fear him. He described the bowling pin incident as one of play and not sexual in nature.

The final day of the hearing was held on January 31, 2017. By that time, Father had fully complied with the requirements of the court's September 16, 2015 order. Both parties presented the testimony of expert psychologists. Also testifying was the Child's therapist, Father, several of Father's co-workers, and the GAL. Finally, and for the first time, the court spoke with the Child.

Father enlisted Dr. Pauline Wallin as his psychological evaluator. Dr. Wallin interviewed Father twice, conducted the Personality Assessment Inventory, reviewed court and other records,

9

and interviewed Mother. Dr. Wallin diagnosed Father with narcissistic personality disorder, noting that he is excessively self-centered and grandiose and reacts impulsively with anger at the slightest criticism or rejection. This impulsivity lessens the effectiveness of any anger management techniques Father may have learned. She further noted that there was little evidence that Father had developed the empathy or self-insight to regulate his emotions in response to any perceived rejection from the Child. Dr. Wallin did not interview the Child, and would not offer an opinion on whether or not the Child would be safe in Father's custody, although she testified that any child would need a mature level of coping mechanisms to deal successfully with Father.

Dr. Robert Gordon was retained by Mother to critique the work of the other psychological evaluators—primarily Dr. Jonathan Gransee and Dr. Pauline Wallin—as well as offer his own diagnosis. Dr. Gordon did not interview Father—noting that this was not necessary under the Pennsylvania Sexual Offenders Assessment Board Standards—but instead read the reports and records before reaching his diagnosis. Dr. Gordon offered a number of criticisms of Dr. Gransee, most significantly his misinterpretation of Father's defensiveness scales as being within the normal range and failure to account for this when interpreting the other measures of the tests employed. Dr. Gordon interpreted Father's results as being very high on the defensiveness scale and suggested that this would impact all other results. Dr. Gordon also found it inappropriate that Dr. Gransee gave a forensic evaluation of Father while simultaneously serving as Father's therapist.

Dr. Gordon largely agreed with Dr. Wallin's methods and many of her conclusions, and found little in her report to criticize. However, he did offer an alternative diagnosis. Dr. Gordon concluded that Father suffers from anti-social personality disorder. This is a more serious diagnosis than that of narcissistic personality disorder. Dr. Gordon testified that whereas the

10

narcissist uses other people to feel important, and therefore reacts angrily to perceived rejection, a person with anti-social personality disorder is characterized by an inability to see the impact his behavior has on others and a disregard for their well-being. Dr. Gordon could not recommend a resumption of the Child-Father relationship at this time, although he conceded that it would be possible once the Child developed sufficient coping mechanisms, perhaps in early adolescence.

Both the GAL and the Child's counselor, Natalie McHenry, testified that their position regarding contact between the Child and Father remained unchanged from the prior hearings despite the passage of time and the continuation of therapy. The child continues to express generalized fear of Father based on passed events, of which she retains clear memories. Child refused to refer to Father by any name other than "him." She expresses a desire not to see Father. Although the GAL and Ms. McHenry acknowledge the seriousness of their recommendations, they both recommended that Father's contact with the Child remain suspended.

Father testified briefly. He again denied giving the Child any reason to fear him. Father has not seen the Child for more than two years, and, although permitted to do so, has not sent her any cards or letters. Father also brought three witnesses from work. All three testified that Father was a good employee and co-worker. However, Dr. Wallin testified that this would not change her diagnosis of Father or cause her to reconsider her recommendations regarding his relationship with the Child.

The Child's behavior while speaking to the court was consistent with the descriptions of her provided by the witnesses. Although initially reserved, she quickly became engaged while speaking about her summer activities, school, music lessons, family, and friends. The subject of her Father, however, was one on she clearly did not wish to engage. She expressed a preference not to see him because of things that had happened in the past.

11

## III. STANDARD OF REVIEW

In making the custody determination, the Court's guiding principle is the best interests of the child, in accordance with the factors set forth in 23 Pa.C.S. § 5328. The test as to the best interests of the child when two parents are involved is evaluated on a scale that is initially weighed equally as to each parent. Sawko v. Sawko, 625 A.2d 692, 695 (Pa. Super. Ct. 1993).

## IV. DISCUSSION

Father seeks some contact with the Child, with such contact being extended until in conformity with the court's November 12, 2014, order. Mother seeks continued suspension of Father's contact with the Child. The testimony and evidence produced over the three-day hearing was largely limited to this question. While the court will consider all the facts set forth in 23 Pa.C.S. 5328(a) as they relate to the Child's best interests, the court relies in part on evidence and testimony presented in prior hearings to find as follows:

1. Which party is more likely to encourage and permit frequent and continuing contact between the children and another party. There is no evidence that Father would fail to comply with a court order which allowed him contact with the Child. Mother did withhold contact with the Child outside a court order between November 2014 and February 2015. However, this was on the recommendation of the Child's therapists and during a Child and Youth Investigation. The court sees no evidence that if in the future the court ordered contact between the Child and Father that Mother would fail to comply.

2. The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child. Mother obtained a PFA against Father, which expired on July 22, 2016. The court is aware of no

12

evidence indicating a risk of abuse to Mother. There have been numerous allegations that Father engaged in sexual grooming behaviors with the Child during his brief periods of unsupervised custody in the fall of 2014, most significantly the bowling pin incident. While Triad Treatment Specialists concluded Father does not show heightened interest in pre-pubescent females, Dr. Gordon quested the basis for this conclusion. However, Dr. Gordon was unable to provide evidence that Father was grooming the Child outside his more general diagnosis that Father suffers from anti-social personality disorder.

2.1 The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services). Children and Youth Services did investigate Father following the bowling pin incident. The Agency marked this report as unfounded.

3. The parental duties performed by each party on behalf of the child. Mother performs the parental duties. Father did perform parental duties during his custody periods in the past.

4. The need for stability and continuity in the child's education, family life and community life. Mother is well suited to provide stability and continuity in the Child's education and family and community life. The Child is doing well in school, interacts regularly with her extended family, and is involved in community activities. Father is only somewhat less stable. He has worked for the same employer for ten years and is by all accounts a good employee. He is involved with a local mosque. He has also remarried, but this is his third wife. It is not clear that Father is involved in the community.

5. The availability of extended family. Father lives with his mother and his wife and child. Any other extended family are in Egypt. Mother lives with her parents. The maternal grandparents have played an important role in the Child's life since her birth.

6. The child's sibling relationships. The Child has no full siblings. She has one half-sibling, Father's other Child, whom she has never met.

7. The well-reasoned preference of the child, based on the child's maturity and judgment. The Child expressed a preference to have no contact with Father. While this preference may not be well-reasoned, the court finds it based on fears very real to the Child. While three years of therapy have done little to abate the Child's fears of her Father, the court hopes that with continued therapy and maturity, the Child will be able to overcome her fears and begin a reunification process at some point in the future.

8. The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm. As expressed at prior hearings, Father believes Mother and her parents have brain-washed the Child, that any of her fears are their creation. The court sees no evidence of this. Instead, the court finds that the Child's fears are based primarily on Father's actions. Father seeming inability to admit he might be at fault for the Child's fear is troubling to the court.

9. Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs. Mother is more likely to maintain a relationship with the Child adequate for the Child's emotional needs. While the court did not find the testimony of Dr. Gransee persuasive, both Dr. Wallin and Dr. Gordon agreed that Father's mental health diagnosis would place a significant burden on the Child. These psychologists concluded that Father lacks empathy and awareness of appropriate social boundaries. He is quick to perceive slights and rejections, and unwilling to let these go. He appears to possess little or no awareness of how his actions

14

affect the emotion well-being of the Child. This is doubly so given her exceptional memory and deep rooted fears based upon Father's past actions towards her. While the court hopes the Child will develop age appropriate coping mechanisms, she has not yet reached such a place of maturity.

10. <u>Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the Child.</u> The Child has no special needs. Mother is able to care for the Child's needs, and where Mother might have limitations regarding the Child's education, the maternal grandparents are willing and able to assist. Father is not well-suited to care for the Child's needs, especially her emotional and developmental needs. Father's mental health diagnoses are discussed in ¶ 15, infra. The Child is afraid of Father and things she associates with Father—primarily Islam. She needs ongoing therapy and a supportive environment. Father appears unable to accept these fears or his role in both causing them and addressing them. The Child will need to mature emotionally and Father will need to address his underlying mental health before a relationship between them is in the Child's best interests.

11. <u>The proximity of the residences of the parties.</u> Both parties live in Lancaster County.

12. <u>Each party's availability to care for the child or ability to make appropriate child-care arrangements.</u> Both parents are capable of making childcare arrangements as necessary.

13. <u>The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.</u> The level of conflict between the parties has been quite high in the past. This will be an area of concern to the court should Father and the Child reach a point where reunification is possible.

14. <u>The history of drug or alcohol abuse of a party or member of a party's household.</u> Not an issue based on testimony or evidence presented.

15. <u>The mental and physical condition of a party or member of a party's household.</u> Neither party has any significant physical conditions that would impair his or her ability to care for the Child. At prior hearings the court heard testimony regarding Mother's diminished mental capacity but found that she was well-able to care for the Child. Father's mental health is of significant concern to the court. Three expert psychologists testified in this case. While they did not agree on a diagnosis, even the most positive, Dr. Gransee, before he abandoned the role of evaluator and assumed that of therapist, concluded that Father had "poor personal boundaries and poor judgment regarding how to behave with a child." (Dr. Gransee Psychological Evaluation, June 18, 2015, p. 15). Even so, the court finds Dr. Gransee's conclusions less persuasive than those offered by Drs. Wallin and Gordon. Dr. Wallin diagnosed Father with narcissistic personality disorder and testified that this means he would be insensitive to the impact of his behavior on others or their needs. The court finds this consistent with the testimony developed at the prior hearing, particularly that Father forced the Child's head to the ground during prayer and his incessant demands that she explain why she is afraid of him. Dr. Gordon returned an even more serious diagnosis of antisocial personality disorder, which in addition to the lack of sensitivity includes a willingness to exploit others to one's own ends. This is of special concern given the allegations of sexual grooming behavior even though such behavior has not been fully substantiated. Finally, even though Dr. Wallin and Dr. Gordon did not agree on a diagnosis, they did agree that Father's personality disorder posed a threat to the Child's emotional development and that the child should be older and more mature—with

16

better coping mechanisms—before she should be expected to bear the burden of a relationship with Father. The court finds this persuasive.

16. <u>Any other relevant factor.</u> None.

Short of terminating parental rights, the conclusion reached by the court is the most drastic that can be taken – to prohibit physical custody of a father with his daughter. The court neither makes this decision lightly nor without much circumspection. However, the responsibility of this court is to the best interests of the child, not the wishes of a parent. It is the sincere hope of the court that reunification between the child and her father will occur one day when Father has consistently worked to address his impairment and ability to interact with his daughter, and when the Child has learned appropriate ways to cope with Father's impairments.

Upon consideration of these statutory factors, the court finds that it is in the Child's best interest for Mother to have sole legal and sole physical custody. An appropriate order follows.

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
CIVIL ACTION - LAW

E. H. "Father"
    Plaintiff,

v.             : No. CI-13-01719

C. H. "Mother"
    Defendant.

## ORDER

AND NOW, this 9th day of February 2017, upon the petitions for special relief filed by both parties, and following a hearing on these matters over three days, and which Plaintiff attended the first day without counsel and the second and third days with counsel, and the Defendant attend with counsel, the court sets forth the following custody order:

## I. LEGAL CUSTODY

C. H. ("Mother") shall have sole legal custody of S. H. (DOB: 4 /2008) ("Child"). Mother shall have the right to make major decisions affecting the child, including, but not limited to, medical, religious, and educational decisions, E. H.

("Father") shall have equal access to medical, dental and school records. Each party shall have access to the residence address. Mother shall ensure that copies of such records or results that she receives are mailed to Father. Each party must avail him or herself of the online means provided by the school to obtain information regarding school programs, events, meetings, teacher conferences, and evaluations.

## II. PHYSICAL CUSTODY

Mother shall have sole physical custody of the Child. Father's contact with the Child is suspended indefinitely.

18

## III. OTHER PROVISIONS

1. The Child shall continue to participate in counseling. This counseling shall address the Child's fears of Father with the goal of alleviating those fears. The counseling shall also help the Child develop coping mechanisms such that she shall be prepared to reunify with Father at some future date.

2. Within sixty (60) days following her twelfth (12) birthday, the Child shall be evaluated by an independent psychologist to determine whether or not she has developed appropriate coping mechanisms. A copy of the report from this evaluation shall be provided to opposing counsel.

3. Father is encouraged to participate in therapy to address his underlying mental health diagnosis.

4. Father has permission to send cards and gifts to the Child. Father should expect any communications with the Child to be read by Mother and the Child's therapist.

5. Mother and Mother's family shall refrain from speaking ill of Father.

6. The appointment of Lisa McCoy, Esq. as guardian *ad litem* is hereby VACATED.

7. The terms of the order may be modified at any time upon mutual consent of the parties or further order of court.

BY THE COURT:

_____
LEONARD G. BROWN, III, JUDGE

ATTEST:
COPIES TO:  Richard Katz, Esq.
Rebecca Cheuvront, Esq.
Lisa McCoy, Esq.

19

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
CIVIL ACTION - LAW

E.H. "Father"
    Plaintiff,

    v.             : No. CI-13-01719

C.H. "Mother"
    Defendant.

### PA R.A.P. 1925 OPINION

The Plaintiff,    E. H.           , has filed a children's fast track appeal of the court's opinion and order dated February 9, 2017. The reasons for that custody decision are stated in the opinion and order dated February 9, 2017, upon which the court relies in compliance with Pa.R.A.P. 1925(a). In response to Plaintiff's statement of matters complained of on appeal, the court addresses the matters individually and further details its rationale for ruling on Plaintiff's petition for special relief and petition to modify custody.

### I. PROCEDURAL HISTORY

This case began when Plaintiff,    E. H.       , ("Father"), filed a complaint in custody on May 8, 2013, against Defendant,    C. H.      ("Mother"). Following two continuances by agreement, the court held a hearing on June 10, 2014. Due to insufficient time to complete the testimony, the court held a second day on October 9, 2014. Both parties attended both days with counsel. The testimony was completed on the second day, and the court issued its November 12, 2014 order. That order granted shared legal custody and granted Mother primary custody. Until June 1, 2015, the extent of Father's periods of custody, and whether they were supervised or unsupervised, was to be determined by the Child's counselor, but Father was not to have less than twenty (20) hours per week. After June 1, 2015, Father was to have partial

NOTICE OF ENTRY OF ORDER OR DECREE
PURSUANT TO PA R.C.P. NO. 236
NOTIFICATION - THE ATTACHED DOCUMENT
HAS BEEN FILED IN THIS CASE
PROTHONOTARY OF LANCASTER CO., PA        1
Apr 10 2017 12:11 PM



unsupervised custody every other Friday and Saturday—but not overnight—and one (1) weekday evening per week.

On November 17, 2014, a mere four (4) days after the entry of the court's order, Mother filed a petition for special relief. This petition was denied without prejudice. Mother refiled her petition on February 23, 2015, and Father filed a petition for special relief on the same day. Those petitions, filed almost two years ago, bring this case again before the court.

The court entered its own order on February 23, 2015, setting a hearing, appointing Lisa McCoy, Esquire ("GAL") as guardian *ad litem*, and suspending Father's contact with the Child. The parties waived the time requirements of Pa.R.C.P. 1915.4 for the start of the hearing, and the hearing was twice continued by agreement. The second continuance was granted to allow Father more time to obtain evaluations. See Order, 6/4/2015. The hearing was not held until September 4, 2015. In the interim, Father's counsel filed a petition on withdraw, as Father was not paying for services. This request was granted. The Guardian filed a report prior to the hearing. Father attended the September 4, 2015, hearing *pro se*; Mother attended with counsel. Father presented two (2) experts at this hearing, his psychological evaluator and a sexual offender treatment specialist. Following that hearing, the court issued an order on September 16, 2015, maintaining the effect of the February 23rd order and laying out a list of requirements for Father to complete prior to petitioning the court for a follow-up hearing.

On February 1, 2016, Father filed a petition to modify. The court issued an order on February 4, 2016, noting that Father should have filed a petition for follow-up rather than a petition to modify and ordered the Office of the Prothonotary to refund his fee. The court further noted that Father had not completed all the requirements outlined in the September 16, 2015,

2

order, including the requirement that he wait at least six (6) months. The court held that it would therefore be inappropriate to schedule a follow-up hearing at the time.

Following this order, Father reobtained counsel, and on March 29, 2016, Father filed a petition for a follow-up hearing. The court scheduled the hearing by ordered dated March 31, 2016. The hearing was to be held on June 3, 2016. On April 14, 2016, Mother filed a petition for special relief, requesting that the court stay the proceedings in this custody action, as the Child's maternal grandparents had filed an action for termination and adoption in Orphan's Court. This request was denied by order filed on May 17, 2016. On May 2, 2016, following a telephone conference with counsel for both parties and the GAL, the court entered an order detailing its expectations for the June 3rd hearing and scheduling a second day for August 30, 2016.

The court held the hearing's second day on June 3, 2016. Both parties attended with counsel and the GAL was present. Father himself testified and again presented the testimony of a sexual offender treatment specialist. Following the hearing, the court issued an order on June 7, 2016, finding that Father had not fully complied with the September 16, 2015, order and ordering him to do so prior to the hearing's second day. On August 30, 2016, counsel for the parties and the GAL attended a telephone conference. Plaintiff's counsel made an oral motion to continue the hearing scheduled for later that day to have time to obtain and assess the psychological evaluation. This motion was granted, and the court issued an order that day rescheduling the third day to January 31, 2017. The GAL filed a supplemental report on January 17, 2017, and the hearing's third day was held on January 31, 2017. Both parties attended with counsel and the GAL was present. Father testified and presented the testimony of a psychological evaluator. Also testifying on Father's behalf were three (3) co-workers. Mother offered the testimony of a

psychologist who evaluated the work of the other experts and offered his own diagnosis. Also testifying was the Child's therapist and the Child herself.

The court issued its opinion and order on February 9, 2017. Father filed his notice of appeal on March 8, 2017, and concurrently filed his concise statement of errors complained of on appeal.

## II. SUMMARY OF THE FACTS

Father is an Egyptian immigrant and a Muslim. Mother grew up in Lancaster County, Pennsylvania, but she was born in South Korea prior to being adopted by her parents (N.T. 6/10/14, p. 93). Mother and her family are Christians (N.T. 6/10/14, p. 95). Father and Mother married in 2002 in Egypt, moved permanently to the United States in 2006, where they lived with Mother's parents, separated in 2010, and divorced in July 2013 (N.T. 6/10/14, p. 96, 134). They have one child together, S. H. (DOB: 4, /2008) ("Child").

At the beginning of her relationship with Father, Mother and her parents worked diligently to understand and experience Father's culture and religion. They read books, visited an imam in Lancaster County, participated in prayers, and even visited Egypt on multiple occasions (N.T. 6/10/14, p. 110). They also assisted Father in obtaining US citizenship (N.T. 6/10/14, p. 134). Following the Child's birth, Mother and Father agreed that she would be raised a Muslim, although she was exposed to both her parents' faiths (N.T. 6/10/14, p. 102-03).

The Child's faith became an issue once the parties separated. Father would become angry when Mother exposed the Child to the Christian faith, to the point where he once refused to leave Mother's residence during a custody exchange and Mother's family resorted to calling the police (N.T. 10/9/14, p. 304-05). Father also insists that the Child practice the Islamic faith (N.T. 6/10/14, pp. 173, 198). While both parents have the right to introduce his or her faith to the

4

Child, Father appears to have done so in a manner emotionally damaging to the Child (See N.T. 6/10/14, p. 104). At one point, he held her head to the floor to make her say her prayers (N.T. 6/10/2014, p. 34). Cultural expectations have also strained the Father-Child relationship. The Child is left-handed, but Father disapproves (N.T. 6/10/14, pp. 14, 21, 26, 199; N.T. 10/9/14, p. 260; N.T. 9/4/15, p. 136). In all of this, Father expresses his disapproval to the Child in a manner which leaves her uncomfortable and fearful, both of Father's religion, Father's culture, and Father himself (N.T. 6/10/14, pp. 35, 38, 77, 85; N.T. 9/4/2015, p. 56).

Father did not have overnight periods of custody following the parties' separation in 2010, but he did have unsupervised custody (N.T. 6/10/14, p. 99; N.T. 9/4/15, p. 37). In January 2013, Mother obtained a temporary PFA order against Father and a final order was not entered until May 3, 2013 (N.T. 6/10/14, p. 100). Prior to the entry of the final order, the Child had been named as a protected party and did not see her Father. To facilitate their reunification, the Child and Father began counseling (N.T. 6/10/14, p. 15). By the time the court entered its November 2014 order, this reunification counseling had been ongoing for one (1) year but had proved only marginally effective. For one, the Child has an impeccable memory; this allows her to recall and relive unpleasant memories created by Father (N.T. 6/10/14, pp. 13, 20; N.T. 10/9/14, pp. 351-53; N.T. 9/4/15, p. 47). Despite this, she had made some progress (N.T. 10/9/14, p. 349), and Father had begun exercising unsupervised custody, although the Child still displayed some reluctance to be alone with him.

Father proved a greater obstacle to the counseling. He was quick to take offense at both the Child and the therapists. He would occasionally become combative during sessions or simply walk out (N.T. 6/10/14, p. 26, 36; N.T. 10/9/14, p. 356-58). While Father agreed that the Child needed therapy, he also expressed the opinion that her fears of him or of Islam were not due to

5

his actions but to the undue influence of Mother and Mother's family (N.T. 10/9/14, p. 289-90). He either did not admit to any of the fear-inducing behaviors relayed by the Child to her therapist or argued that those behaviors were not unreasonable (N.T. 10/9/14, p. 291). Still, in November of 2014 the court ordered the parties to continue to undergo reunification counseling. The court continued to give the Child's therapist some deference, but also laid out a deadline by which Father could expect to begin exercising unsupervised custody (See Order, 11/12/14).

On November 17, 2014, Mother filed a petition for special relief asking the court to suspend Father's contact with the Child until allegations of inappropriate sexual contract between Father and the Child were investigated by Children and Youth Services. These allegations included Father asking the Child to spank him with a plastic bowling pin, after which he laid on the floor for some time breathing heavily. Father also regularly kissed the child all over her face, hands, and feet and had her straddle his lap for prolonged periods of time. All of these requests were upsetting to the Child. The court denied this petition without prejudice (See Order, 11/17/14). While the court order in effect at that time gave Father no less than twenty (20) hours with the Child, Mother withheld the Child from Father upon the recommendation of the Child's therapist (N.T. 9/4/15, p. 35-37).

Mother refiled her petition on February 23, 2015. In her petition, Mother alleged that in early November 2014, Father insisted the Child spank him with a toy bowling pin (See also N.T. 9/4/15, p.39). Even though Children and Youth Services determined the allegations to be unfounded for sexual abuse, Mother, relying on the Child's therapists, believed this to be grooming behavior (N.T. 9/4/15, p. 47). The court's order of February 23, 2015, suspended Father's contact with the Child.

6

Three (3) hearings followed, spread over two (2) years. At the first hearing, on September 4, 2015, the court heard the testimony of two (2) evaluators of Father, David Berk and Dr. Jonathan Gransee. Mr. Berk is a certified sexual offender treatment specialist employed by Triad Treatment Specialists, Inc. (N.T. 9/4/15, p. 5). He evaluated Father for four (4) hours, conducting a number of tests, including the Abel Assessment of Sexual Interest (N.T. 9/4/15, p. 8-9). The results of this assessment were compromised, however, as Father refused to perform the slide portion of the test, citing his religious beliefs (N.T. 9/4/15, p. 10). Mr. Berk testified that while Father showed no deviate sexual interests on the completed portions of the Assessment, he did consistently underreport his anger, hostility, and ability to control those emotions (N.T. 9/4/15, p. 15). Mr. Berk recommended that Father receive therapy in coordination with psychiatric care. He expressed the opinion that Father's contact with the Child should remain suspended until he received this treatment (N.T. 9/4/15, pp. 18-19).

Dr. Jonathan Gransee is a psychologist (N.T. 9/4/15, pp. 88-89). He evaluated Father over one (1) and one-half (1/2) hours and conducted the MMPI Assessment (N.T. 9/4/15, p. 92). Dr. Gransee diagnosed Father with impulse control disorder. He found Father to be suffering from stress and anxiety and unable to respect appropriate social boundaries with others (N.T. 9/4/15, pp. 101-02, 107). Dr. Gransee suggested that Father address these through therapy and anger management classes, as well as medication (N.T. 9/4/15, pp. 103, 106). He further testified that he himself had completed therapy session with Father and that Father was on medication for anxiety and depression (N.T. 9/4/15, pp. 110-11). Dr. Gransee deferred any comment on the sexual allegations to the expert from Triad (N.T. 9/4/15, p. 109). He also refused to take a firm stance on the appropriateness of the court's suspension of Father's contact with the Child (N.T. 9/4/15, pp. 103-04).

The court also heard from Kathrine DeStefano, the therapist directing the reunification counseling between Father and the Child (N.T. 9/4/15, p. 34-35). Although a licensed therapist, Ms. DeStefano testified as a fact witness, not an expert, and the court did not give weight to her opinion that Father views the Child as an object of sexual desire rather than a daughter (See N.T. 9/4/15, p. 47). Ms. Destefano also testified regarding Father's behavior during their reunification sessions, that he was unable to consistently respect the Child's feelings and boundaries and that she appeared afraid of him. Father was also occasionally angry with the therapists or the office staff (N.T. 9/4/15, p. 45-46).

Also testifying at the September 2015 hearing was Natalie McHenry, the Child's therapist (N.T. 9/4/15, p. 66). She testified that while she was initially supportive of the reunification between Father and the Child, she no longer held that position (N.T. 9/4/15, p. 69). Ms. McHenry testified that despite all the therapy the Child has received, she becomes immediately afraid at the least mention of her Father (N.T. 9/4/15, p. 67-70). The Child had also recounted to Ms. McHenry the bowling pin incident, and Ms. McHenry expressed her opinion that this was sexual grooming behavior on the part of Father (N.T. 9/4/15, p. 70-73). However, like Ms. DeStefano, Ms. McHenry testified as a fact witness only, and not an expert.

The GAL also testified to add clarity to her report. She had reviewed all court documents, as well as the records of the Child, Mother, and Father. She had also spoken to the various evaluators and therapists, a supervisor at the Children and Youth Services Agency, and to several experts on Egyptian culture and the Islamic religion (N.T. 9/4/15, pp. 128-30). She testified to her observation that the Child appeared genuinely afraid of Father, especially when recounting the bowling pin incident (N.T. 9/4/15, p. 133). The GAL recommended that the current

8

suspension of contact remain in place until Father had followed the recommendations of Dr. Gransee and Triad (N.T. 9/4/15, p. 132).

Finally, the court heard from Father's imam. The imam testified that Father is a regular participant at the mosque (N.T. 9/4/15, p. 27). He remembered Father bringing the Child to the mosque previously and though she had seemed happy to be there, to learn Arabic and study the Koran (N.T. 9/4/15, p.28-9). He also testified that it was not acceptable within the Islamic faith for a parent to ask a child to strike in on the buttocks, or for a parent to kiss a child to the point where the child was made uncomfortable by the parents' behavior. (N.T. 9/4/15, pp. 32-33).

Following this hearing, the court issued an order on September 16, 2015, which continued the temporary suspension of contact between the Child and Father. The court further required Father to complete the following requirements:

1. Consultation with a licensed psychiatrist regarding anxiety medications.

2. Twenty (20) therapy sessions with a licensed professional counselor.

3. Weekly participation in domestic violence or anger management support group for a minimum of six (6) months.

4. Participation in parenting education classes or work with a private parent trainer.

5. No sooner than six (6) months, undergo reevaluation by Triad, including the slide portion of the Abel Assessment

6. No sooner than six (6) months, undergo reevaluation by a psychologist or psychiatrist.

Once Father completed these requirements, he could petition for a follow-up hearing.

At the next hearing, on June 3, 2016, the court determined that Father had not fully complied with the requirements of the September 16, 2015, order. He had complied with numbers 2 and 4 above and substantially complied with 1 and 5. Father failed to comply with 3

9

or 6 in that he did not participate in an anger management support group or undergo a reevaluation by a psychologist or psychiatrist. Nevertheless, the court went forward with the hearing to hear evidence on the requirements Father had completed.

The court heard testimony from Molly Simmons, a clinician with Triad Treatment Specialists (N.T. 6/3/16, p. 5). Ms. Simmons conducted the reevaluation of Father as ordered by the court. She admitted that Father did not wait the six (6) months as required by the court's order, but stated that this would not affect the results of the tests (N.T. 6/3/16, p. 8). Father redid the Abel Assessment in January 2016, this time completing the slide portion of the test. The slide portion is objective in the sense that Father's reactions to the slides are measured, not self-reported (N.T. 6/3/16, p. 11). The test revealed that Father showed the most sexual interest in adult females and significant sexual interest in post-pubescent females. Father showed no significant sexual interest in pre-pubescent females (N.T. 6/3/16, p. 15).

Father also testified at the June 3rd hearing. He admitted to not fully complying with the requirements of the court's September 16th order, but testified that he was unrepresented at the time, has some difficulty with the language, and found the order confusing (N.T. 6/3/16, p. 40). Father testified that the complied with portions of the order had been helpful to him (N.T. 6/3/16, p. 46). He denied having any issues with anger or giving the Child any reason to fear him. He described the bowling pin incident as one of play and not sexual in nature (N.T. 6/3/16, pp. 72-73).

The final day of the hearing was held on January 31, 2017. By that time, Father had fully complied with the requirements of the court's September 16, 2015, order. Both parties presented the testimony of expert psychologists. The Child's therapist, Father, several of Father's co-

10

workers, and the GAL also testified. Finally, and for the first time, the court spoke with the Child.

Father enlisted Dr. Pauline Wallin as his psychological evaluator. Dr. Wallin interviewed Father twice, conducted the Personality Assessment Inventory, reviewed court and other records, and interviewed Mother (N.T. 1/31/17, pp. 6-8). Dr. Wallin diagnosed Father with narcissistic personality disorder, noting that he is excessively self-centered and grandiose and reacts impulsively with anger at the slightest criticism or rejection (N.T. 1/31/17, p. 18). This impulsivity lessens the effectiveness of any anger management techniques Father may have learned. She further noted that there was little evidence that Father had developed the empathy or self-insight to regulate his emotions in response to any perceived rejection from the Child (N.T. 1/31/17, pp. 38-40). She testified that Father would overreact emotionally to any perceived rejection from the Child (N.T. 1/31/17, p. 41). Dr. Wallin did not interview the Child, and would not offer an opinion on whether or not the Child would be safe in Father's custody (N.T. 1/31/17, p. 39), although she testified that any child would need a mature level of coping mechanisms to deal successfully with Father (N.T. 1/31/17, pp. 45, 50).

Dr. Robert Gordon was retained by Mother to critique the work of the other psychological evaluators—primarily Dr. Jonathan Gransee and Dr. Pauline Wallin—as well as offer his own diagnosis (N.T. 1/31/17, p. 54). Dr. Gordon did not interview Father but instead read the reports and records before reaching his diagnosis. Dr. Gordon offered several criticisms of Dr. Gransee, most significantly his misinterpretation of Father's defensiveness scales as being within the normal range and failure to account for this when interpreting the other measures of the tests employed. Dr. Gordon interpreted Father's results as being very high on the defensiveness scale and suggested that this would impact all other results (N.T. 1/31/17, pp. 64-

11

65, 68). Dr. Gordon also found it inappropriate that Dr. Gransee gave a forensic evaluation of Father while simultaneously serving as Father's therapist (N.T. 1/31/17, p. 64).

Dr. Gordon largely agreed with Dr. Wallin's methods and many of her conclusions, and found little in her report to criticize. However, he did offer an alternative diagnosis. Dr. Gordon concluded that Father suffers from anti-social personality disorder (N.T. 1/31/17, p. 56). This is a more serious diagnosis than that of narcissistic personality disorder. Dr. Gordon testified that whereas the narcissist uses other people to feel important, and therefore reacts angrily to perceived rejection, a person with anti-social personality disorder is characterized by an inability to see the impact his behavior has on others and a disregard for their well-being (N.T. 1/31/17, p. 58-59). Dr. Gordon could not recommend a resumption of the Child-Father relationship at this time, although he conceded that it would be possible once the Child developed sufficient coping mechanisms, perhaps in early adolescence (N.T. 1/31/17, p. 76-77).

Both the GAL and the Child's counselor, Natalie McHenry, testified that their position regarding contact between the Child and Father remained unchanged from the prior hearings despite the passage of time and the continuation of therapy (N.T. 1/31/17, pp. 117, 154). The child continued to express generalized fear of Father based on passed events, of which she retains clear memories. Child refused to refer to Father by any name other than "him." She expresses a desire not to see Father (N.T. 1/31/17, p. 152-53). Although the GAL and Ms. McHenry acknowledge the seriousness of their recommendations, they both recommended that Father's contact with the Child remain suspended (N.T. 1/31/17, pp. 113-14, 154).

Father testified briefly. He again denied giving the Child any reason to fear him. Father also brought three (3) witnesses from work. All three (3) testified that Father was a good employee and co-worker (N.T. 1/31/17, pp. 130, 136, 142).

12

The Child's behavior while speaking to the court was consistent with the descriptions of her provided by the witnesses. Although initially reserved, she quickly became engaged while speaking about her summer activities, school, music lessons, family, and friends. The subject of her Father, however, was one on she clearly did not wish to engage. She expressed a preference not to see him because of things that had happened in the past (N.T. 1/31/17, pp. 194-199).

## III. STANDARD OF REVIEW

### A. Trial Court Standard of Review

"[T]he paramount concern in child custody proceedings is the best interest of the child." Moore v. Moore, 634 A.2d 163, 169 (Pa. 1993). In making the custody determination, the court's guiding principle is the best interests of the child, in accordance with the factors set forth in 23 Pa.C.S.A. § 5328. The test as to the best interests of the children when two parents are involved is evaluated on a scale that is initially weighed equally as to each parent. Sawko v. Sawko, 625 A.2d 692, 695 (Pa. Super. Ct. 1993). In a custody action, the particular circumstances of the case must be considered, and each case is to be decided on its own individual facts. N.H.M. v. P.O.T., 947 A.2d 1268, 1273 (Pa. Super. Ct. 2008); E.A.L. v. L.J.W., 662 A.2d 1109, 1118 (Pa. Super. Ct. 1995).

### B. Appellate Standard of Review

It is well established that the scope of review of this court in child custody disputes is of the broadest type—abuse of discretion. In re Arnold, 428 A.2d 627, 628 (Pa. Super. Ct. 1981); Commonwealth ex rel. Spriggs v. Carson, 368 A.2d 635 (Pa. 1977). An abuse of discretion in the context of child custody does not consist merely of an error in judgment. K.B. II v. C.B.F., 833 A.2d 767 (Pa. Super. Ct. 2003); T.B. v. L.R.M., 753 A.2d 873 (Pa. Super Ct. 2000), order aff'd, 786 A.2d 913 (Pa. 2001). Abuse of discretion exists only when trial court overrides or misapplies

13

the law in reaching its conclusion or when its judgment is manifestly unreasonable or the result of partiality, prejudice, bias, or ill will, as shown by the evidence of record. N.H.M. v. P.O.T., 947 A.2d 1268, 1272 (Pa. Super. Ct. 2008); K.B. II v. C.B.F., 833 A.2d 767 (Pa. Super. Ct. 2003).

An appellate court is bound by the trial court's factual findings if they are supported in the record; the appellate court exercises its own independent deductions and inferences from facts as found by trial court judge. Anderson v. McVay, 743 A.2d 472 (Pa. Super. Ct. 1999); K.W.B. v. E.A.B., 698 A.2d 609 (Pa. Super. Ct. 1997). Because the Superior Court's role does not include making independent factual determinations, when reviewing a custody order, the Superior Court must accept findings of the trial court that are supported by competent evidence of record. J.M.R. v. J.M., 1 A.3d 902, 911 (Pa. Super. Ct. 2010) quoting Collins v. Collins, 897 A.2d 466, 471 (Pa. Super. Ct. 2006); In re K.T.E.L., 983 A.2d 745, 749 (Pa. Super. Ct. 2009). About issues of credibility and weight of the evidence, the Superior Court must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. J.M.R., 1 A.3d at 911 quoting Collins, 897 A.2d at 471

## IV. DISCUSSION

Father raises three errors in his statement of matters complained of on appeal ("Statement"). The court addresses each in turn.

### A. The Psychological Testing

Father submitted to numerous psychological tests during the custody proceedings. He now argues that this testing was inappropriate and the court erred in relying on it in making its custody decision. Father's first complaint on appeal is as follows:

> The Lower Court erred in accepting the results of psychological testing which were conducted in a language and having cultural content which is not the

14

first language of the Appellant and with which he exhibited difficulty; and using such as a basis for its decision.

Statement. ¶ 1.

First, at no point during the proceedings did Father object to the language of the psychological tests. Nor did Father object that these tests reflected a particular cultural context. In fact, Father did not object in any way to the introduction of any evidence or testimony concerning Father's performance in the tests. Because Father failed to object to this evidence, this issue is waived.

> In order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court. Failure to timely object to a basic and fundamental error will result in waiver of that issue. On appeal the Superior Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected.

Summers v. Summers, 35 A.3d 786, 790 (Pa. Super. 2012) quoting Hong v. Pelagatti, 765 A.2d 1117, 1123 (Pa. Super. 2000).

Even if the appellant court finds that this issue is not waived due to Father's failure to object, the court did not commit an abuse of discretion in relying on the psychological tests and using them as a basis for its decision. Father underwent the following psychological evaluations:

1. With David Burk – the Abel Assessment of Sexual Interest (partial).
2. With Dr. Gransee – the Minnesota Multiphasic Personality Inventory.
3. With Molly Simmons – the Abel Assessment of Sexual Interest (full).
4. Dr. Wallin – the Personality Assessment Inventory.

For each of these tests, Father either brought an interpreter with him or used an interpretation application on his mobile device (N.T. 1/31/17, p. 8). In each case, the evaluators gave Father the time necessary to complete the assessments. While the evaluators testified regarding the impact of Father's language and culture differences on the test results none of them expressed any

15

hesitations in relying on those results (See N.T. 6/3/16, pp. 13-14, 30; N.T. 1/31/17, p. 81). As such, the court did not err in relying on the results in making its custody decision.

B. The Factors

Father next argues that "[t]he Lower Court erred in its assessment of the statutory factors in awarding sole legal and physical custody to the Appellee." Statement, ¶ 2. The court's primary concern in custody proceedings is the best interests of the child. See § III.A, supra. The Domestic Relations statute allows for an award of both sole legal custody and sole physical custody. See 23 Pa.C.S.A. 5323(a)(4), (7). The court heard three (3) full days of testimony on this matter, and analyzed in its opinion each of the statutory factors enumerated under 23 Pa.C.S.A. 5328(a). Of particular concern to the court were factors 8, 9, and 15. Based on the evidence and testimony presented at the hearing, the court found that at the present time Father would be unable to form a nurturing relationship with the Child and unable to care for the Child's emotional needs (Factors 8 and 9). More troubling to the court was the extent and nature of Father's mental health diagnosis (Factor 15). Even the psychologist retained by Father testified that Father's personality disorder posed a threat to the Child's emotional well-being and that the child should be older and more mature before she should be expected to bear the burden of a relationship with Father. The court gave this evidence significant weight, and this determination cannot be disturbed on appeal absent any abuse of discretion. See M.J.M v. M.L.G., 63 A.3d 331, 334 (Pa. Super. 2013) ("[W]ith regard to issue of credibility and **weight of evidence**, [the appellate court] must defer to the presiding trial judge who viewed and assessed the witnesses first-hand.") (emphasis added).

C. No Contact

Father's final issue raised on appeal is that "[t]he Lower Court erred in providing no contact with the Parties' child by the Appellant." Statement, ¶ 3. Contrary to Father's assertion,

16

the court's order does not prohibit all contact between Child and Father. The order specifically gives Father permission to send cards and gifts to the child, something he has been encouraged to do since the filing of this case, but has not done. Opinion, p. 19. However, the order does not provide Father with any physical custody of the Child, even supervised physical custody. The custody statute allows for an award of sole physical custody. See 23 Pa.C.S.A. § 5323(a)(4). Such an award is an alternative to, *inter alia*, supervised physical custody. 23 Pa.C.S.A. § 5323(a)(5). The court made this award based on the evidence presented by both Mother and Father that Father suffers from a significant personality disorder and any contact between Father and Child would significantly burden the Child given her age, emotional state, and level of maturity. Both psychologists testified that even supervised physical custody would not be in the Child's best interest at the present time. The court's award of sole physical custody to Mother and denial of any custodial time to Father is not a termination of Father's parental rights, however. As the court noted at the conclusion of its Opinion: "It is the sincere hope of the court that reunification between the child and her father will occur one (1) day when Father has consistently worked to address his impairment and ability to interact with his daughter, and when the Child has learned appropriate ways to cope with Father's impairments." Opinion, p. 17. Furthermore, the court directed that "[w]ithin sixty (60) days following her twelfth (12) birthday, the Child shall be evaluated by an independent psychologist to determine whether or not she has developed appropriate coping mechanisms." Id. at 19.

## V.  CONCLUSION

The scope of appellate court review in child custody disputes is of the broadest type— abuse of discretion. In re Arnold, 428 A.2d 627, 628 (Pa. Super. Ct. 1981); Commonwealth ex rel. Spriggs v. Carson, 368 A.2d 635 (Pa. 1977). In this case, the court carefully considered the

best interests of the Child, and reached the conclusion to prohibit physical custody of a father with his daughter. The court did not make this decision lightly nor without much circumspection. The court did not override or misapply the law, and the court's conclusion was not manifestly unreasonable or the result of partiality, prejudice, bias, or ill will, as shown by the evidence of record. N.H.M. v. P.O.T., 947 A.2d 1268, 1272 (Pa. Super. Ct. 2008). The court's decision should be upheld.

BY THE COURT:

_____
LEONARD G. BROWN, III, JUDGE

ATTEST: M Zerner / Clerk

COPIES TO:   Richard Katz, Esq.
             Rebecca Cheuvront, Esq.

18